**BELL v. RAMIREZ et al.    (No. 7106.)***

Court of Civil Appeals of Texas.    Austin.
July 27, 1927.

Rehearing Denied Oct. 1, 1927.    Writ of Error Refused Nov. 23, 1927.

1. Mortgages ⬅6—Deed executed in consideration of extinguishment of pre-existing debt and simultaneous agreement, giving right to repurchase, is "conditional sale," and not a "mortgage."

A deed absolute in form if executed in consideration of discharge and extinguishment of pre-existing debt, and on a simultaneous agreement in writing or parol, giving grantor right to repurchase within a specified time on payment of specified consideration, is a "conditional sale," and not a mortgage.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Conditional Sale; Mortgage.]

2. Mortgages ⬅36—Grantor has burden of showing that deed was in fact intended as mortgage, where collateral agreement imports conditional sale.

Where collateral agreement at time of execution of deed absolute in form, giving grantor right to repurchase property, is in writing and its express terms import a conditional sale, burden rests upon grantor to show that it was in fact intended as a mortgage.

3. Homestead ⬅115 (2), 133—Evidence held, as matter of law, to establish that deed to homestead was mortgage in fact and void as to grantee and those claiming under him with notice.

In action to secure cancellation of deed, evidence held to establish, as matter of law, that deed was in fact a mortgage to secure grantee in his fees and expenses as attorney for grantor, and was not a conditional sale, and, property constituting grantors' homestead, the deed was therefore void as to grantee and those claiming under him with notice.

4. Mortgages ⬅6—Whether deed was mortgage or conditional sale depends on agreement of parties at time of execution.

Whether deed executed by owner constituted a mortgage or conditional sale depends on agreement of parties at time of its execution, since character could not be changed by subsequent agreement unless the contract was abrogated and extinguished by a new contract supported by adequate consideration.

5. Attorney and client ⬅123(2)—Evidence held insufficient, as matter of law, to overcome presumption of fraud in clients' deed to attorney.

In suit to cancel deed executed to attorney at time of relation of attorney and client between grantor and grantee, evidence held insufficient, as matter of law, to overcome presumption of constructive fraud in transaction.

6. Attorney and client ⬅123(2)—Agreements between attorney and client in course of relation are prima facie presumed fraudulent.

Relation of attorney and client is one of uberrima fides, and agreements between them in course of relation are prima facie presumed to be fraudulent; burden of showing them otherwise being cast, as a matter of law, upon the attorney.

7. Appeal and error ⬅997(3)—Request by both parties for directed verdict did not require sustaining judgment if supported by any evidence.

Request by both parties for directed verdict held not to operate to take case from jury on facts so as to require that judgment be sustained if supported by any evidence.

Appeal from District Court, Travis County; George Calhoun, Judge.

Suit by Jesus Ramirez and wife against Harris Bell and another. From the judgment, defendant named appeals. Affirmed in part, and in part reversed and remanded.

O. Dickens, Warren W. Moore, Cofer & Cofer, and D. J. Pickle, all of Austin, and Marshall Bell, of San Antonio, for appellant.

Hart, Patterson & Hart and Garrett, Brownlee & Goldsmith, all of Austin, for appellees.

McCLENDON, C. J. Jesus and Refugia Ramirez, husband and wife, sued Harris Bell and Charles Wendlandt, Jr. (1) to cancel ap-

pellees' deed of June 25, 1925, conveying to Bell their homestead of 121.64 acres of farm land in Bastrop county; and (2) to cancel Bell's deed of trust to Wendlandt of August 6, 1925, securing $5,000 by lien upon the same property.

Trial to jury; directed verdict; judgment: (1) As to Bell, canceling his deed and awarding appellees $3,136.15 against him; and (2) as to Wendlandt, establishing and foreclosing his trust deed lien. Separate appeals (1) by Ramirez and wife against Wendlandt, and (2) by Bell against Ramirez and wife.

In the Ramirez appeal we are reversing the judgment establishing and foreclosing the trust deed lien and remanding that branch of the case for a new trial. See opinion, 298 S. W. 924.

Appellees rely upon the two following propositions (both of which we sustain) as supporting the direction of verdict canceling Bell's deed and awarding appellees damages:

(1) The deed was in fact a mortgage to secure Bell in his fees and expenses as attorney for Ramirez, and not a conditional sale, as appellant contends.

(2) The relation of attorney and client existed between Bell and Ramirez when the deed was executed, which fact raised the presumption of constructive fraud and cast upon Bell the burden of showing utmost good faith, a full and fair price, absence of pressure of influence by the confidential relation, and that no advantage was taken of his client, which burden Bell failed to discharge.

Appellant contends that the record presents these propositions only as issues of fact.

We summarize the pertinent facts from Bell's viewpoint:

Bell, an attorney, 25 years old, of 2 years' practice, was engaged by Ramirez to obtain bail and defend him in four felony indictments in Bastrop county for violations of the liquor law. Bell made several trips to Bastrop and obtained the desired bail. Ramirez paid Bell $75 to cover expenses, and on June 20, 1925, he agreed with Ramirez on a fee of $1,000, which Ramirez claimed was to be in full, and Bell claimed was only a retainer, the balance to be later agreed on. Ramirez executed his note for this $1,000 and agreed to secure it by lien on the land in question, which then constituted his homestead, the value of which was variously estimated at from $9,000 to $15,000. At the same time Bell had him execute an instrument designating as his homestead an unimproved lot in Austin, which he had never occupied. Bell also prepared a trust deed on the farm for execution by Ramirez and wife to secure the note. Bell later consulted Senator Page, of Bastrop, with a view of engaging him to assist locally in the cases, and was informed by him that $500 was the usual fee in such cases, and that a total of $2,000 for

the four cases, to be divided equally between them, would be ample.

Senator Page's version differs from Bell's in that his best recollection was he told Bell "that $1,200 or $1,500 split between our firms would be a good big fee, and I would be willing to split it." He also testified to the following conversation, which Bell did not deny:

"I said, 'The thing I am interested in is the matter of fee, what shape is he in?' He said, 'He has a valuable farm out here'—he might not have used the term valuable, but a good farm; and I said, 'How much has he got on it?' and he said, 'He is a married man, living on the farm.' I said, 'That's a homestead, how are you going to secure it?' and he said, 'I am going to get a deed to that farm—get the place.' And I said, 'Well, what is it worth?' According to my recollection now, he said six or seven or eight thousand dollars—something like that; and I said, 'Well, you mean you are going to get a straight deed to the farm?' And my recollection is he said, 'Yes.' I said, 'Well, you know a deed, if you agree to deed it back to him, will be valueless, will be no more than a mortgage.' He said, 'He is going to give a straight deed in consideration of this fee.' I said, 'Well, that would be too much fee, you are overcharging him,' and, I said, 'You are a young man and ought not to start out with big fees like that.' I said the fee would be too large for the transaction involved. * * *

"He left my office, and according to my recollection I saw him one time after that, whether in Bastrop or Austin I don't know, but anyhow he said he hadn't made arrangements with the Mexican, and would see me later; but he didn't see me later, and I haven't seen him except casually. And that is all that occurred."

Ramirez and wife signed the deed in Bell's office and acknowledged it before a notary in his employ on June 25, 1925. They claimed that the contents of the deed were fraudulently misrepresented to them by Bell as a mortgage to secure the $1,000 note. Bell denied this and testified that he then agreed with Ramirez upon a total fee of $3,000, out of which he was to bear all expense in preparing and trying the cases, including payment of associate counsel fees; that the deed was executed with the understanding that Bell was to obtain a loan upon the property or sell it, pay off the back taxes and an amount due Seelig for balance of purchase money, and, if he realized additionally more than enough to pay the $3,000 fee, he would turn it over to Ramirez. The following extracts are from Bell's testimony on this point:

"At that time I told Jesus that the only way I would handle his cases would be for me to pay all the expenses, the expenses of the trial, the expense of employing a lawyer in Bastrop to help me, and all the incidental expenses, and that my fee to represent him would be $750 a case, out of which I would pay all the expenses. I told him the debts and back taxes would have to be paid. As to what they told me when I

said my fee would have to be $2,000 in addition to the $1,000 retainer, or $3,000 in all, including another lawyer, they objected; they thought it was high. I told them to·go and get somebody else, that I would not handle it for anything less, and they finally said, 'All right.' They agreed to it. * * * I told them the only way I would handle the cases would be for them to deed me the property, and outlined to them what they owed and my fee, and that it would take $5,000 to pay what they owed and pay my fee, and if I had to sell the property I would give them all over $5,000 I got. * * * As to what they said in reference to the proposal, it was all right."

Bell first made application, through Whitis, of Austin, to the Southwestern Mortgage Company, of Dallas, for a loan of $6,500, at 6½ per cent. on the property. He signed a written application on July 8, 1925, in which he gave the value of the property as $16,750, of which $250 was improvements, and stated he had paid for it $15,000 in cash and assumption of notes. The company sent Lynch to Austin to inspect the land, which he did, accompanied by Whitis and Bell. While there Lynch talked in Spanish to a Mexican woman on the place, and on the way back stated in Bell's hearing (according to Whitis) "that he could not make the loan, because he thought it would be an evasion of the homestead law." Lynch's version of this statement was "that there was a homestead feature, and that if the Mexicans moved off we probably could consider it, but as long as they were in possession we could not make the loan." Lynch placed a value on the property of $10,500. In explanation of this application for·a $6,500 loan Bell testified he intended to pay over to Ramirez the $1,500 excess over the incumbrances and his fee.

Bell obtained a loan of $5,000 on the property from Wendlandt, out of which the Seelig balance and taxes, abstracter's fee, $65, and attorney's fee for examining title, $50, were paid, leaving a balance of $2,980, which Wendlandt paid Bell by check. Quoting Bell further:

"Shortly after I placed the loan on the property with Wendlandt, Jesus Ramirez came up in the office. I told him what I had done, and that I had placed the loan on the property, that I had paid the notes that he owed to Mr. Seelig, that I had paid his back taxes, that I had gotten the loan strung out over a period of 5 years and included my fee, and if he would stay and work the place and take care of the notes as they were due, as soon as they were paid, I would deed the place back to him."

There was no evidence other than the statement of Senator Page to Bell bearing upon the reasonableness of the $3,000 fee.

Appellant relies upon the following cases as supporting his contention that the evidence raises the fact issue of a conditional sale: Ruffier v. Womack, 30 Tex. 332; Hubby v. Harris, 68 Tex. 91, 3 S. W. 558; Harvey

299 S.W.—42

v. Eden, 69 Tex. 420, 6 S. W. 306; Miller v. Yturria, 69 Tex. 549, 7 S. W. 206.

[1] These cases hold that a deed absolute in form if executed in consideration of the discharge and extinguishment of a pre-existing debt, and upon a simultaneous agreement in writing or parol, giving the grantor the right to repurchase within a specified time upon payment of a specified consideration, is a conditional sale, and not a mortgage.

[2] Where the collateral agreement is in writing and its express terms import a conditional sale, the burden rests upon the grantor to show that it was in fact intended as a mortgage.

[3] Under Bell's testimony he held Ramirez's note for $1,000 retainer and stated to Ramirez and wife that his entire fee would be $3,000; that the only condition under which he would continue in the cases was for them to deed him the property, and he was to raise the money by loan, and, if need be, by sale, to pay off the taxes, balance of Seelig debt, and his fee of $3,000, any balance to go to them. There was no·suggestion of a reconveyance to them upon any condition or at any specified time. The effect of this agreement was to place the legal title in Bell in order that he might raise by loan or sale a sum sufficient to pay the debt then on the property and his fee. This transaction presents no element of conditional sale. Its only purpose was to invest Bell with power to raise money by mortgage or sale to discharge a debt to him, and, at most, was only security for a debt and could be upheld only as a mortgage. The property being homestead, it was therefore void as to Bell and those claiming under him with notice.

[4] Bell's testimony, that after he had negotiated the Wendlandt loan he told·Ramirez that if he would stay on the place and pay off the loan he would redeem him the place, could have no effect upon the character of the transaction. Whether the instrument was a mortgage or conditional sale depends upon the agreement of the parties at the time of its execution. Its character could not be changed by a subsequent agreement "unless the contract is abrogated and extinguished by a new contract, supported by an adequate consideration." Ruffier · v. Womack, above. This statement, however, was nothing more than Bell's expression of what he intended to do. And this expression· was nothing more than what he was legally obligated to do under the transaction as detailed by him. He acquired no interest in the land except to raise the agreed amount. This had been accomplished, and, even had the land ·not been homestead, Ramirez was then entitled to a reconveyance, subject to the lien Bell had created. Bell's only remaining interest in the matter arose .out of his personal liability on the Wendlandt notes, and this·interest, as the facts show

without dispute, was more theoretical than real, as the land was worth from two to three times the amount of the notes he had signed.

[5] Upon appellees' second contention, the evidence is without conflict that when the agreement for the $3,000 fee was made and the deed executed the relation of attorney and client existed, and there was no testimony given or offered that the fee was a reasonable one for the services then and to be rendered. When Ramirez and wife objected to the fee as high, no suggestion was made that they seek the advice of friends or disinterested counsel. They were told that they could either sign the deed or Bell would abandon the case and they could get other counsel. According to Bell's version, they submitted with childlike docility and executed an instrument which placed in him the unconditional title to their accumulations of a lifetime, with no writing from him or other witness to show their rights in the matter. The transaction was, to say the least, unusual, and even under Bell's version can only be explained, aside from the fact that Ramirez and wife were ignorant and inexperienced in such matters, as an unusual instance of unlimited confidence. The transaction, as detailed by Bell, speaks in language so plain as to render comment superfluous.

[6] The well-established rule that the relation of attorney and client is one of uberrima fides rests upon the highest considerations of public policy, and agreements between them in the course of the relation are prima facie presumed to be fraudulent, the burden to show them otherwise being cast, as a matter of law, upon the attorney.

Specifically it was held in Coon v. Ewing (Tex. Civ. App.) 275 S. W. 481, to quote from the syllabus:

That the "burden is on attorney, suing client for additional compensation under contract made after establishment of relation, to show that contract is just, fair, reasonable, and supported by adequate consideration, and was freely made by client."

No effort was made to meet this burden in any particular. Indeed, the only testimony in any way tending to bear upon it was the conference which Bell had with Senator Page, an able and experienced practitioner, and that evidence denounced the fee which Bell exacted as being at least 50 per cent. excessive.

It may not be amiss to add the following pertinent quotations:

"The situation of an attorney or solicitor puts it in his power to avail himself not only of the necessities of his client, but of his good nature, liberality, and credulity, to obtain undue advantages, bargains, and gratuities. The law does not so much consider the bearing or hardship of its doctrine upon particular cases as it does the importance of preventing a general public mischief which may be brought about by means secret and inaccessible to judicial scrutiny from the dangerous influence arising from the confidential relations of the parties.

"By establishing the principle that while the relation of attorney and client subsists in its full vigor the latter shall derive no benefit to himself from the contracts or bounty or other negotiations of the former, it supersedes the necessity of any inquiry into the particular means, extent, and exertion of influence in a given case—a task often difficult and ill supported by evidence which can be drawn from any satisfactory sources. The doctrine is not necessarily limited to cases where the contract or other transaction respects the rights of property in controversy in the particular suit in respect to which the attorney or solicitor is advising or acting for his client; but it may extend to other transactions and contracts disconnected therefrom, or at least where from the attendant circumstances there is reason to presume that the attorney and solicitor possessed some marked influence, ascendency, or other advantage over his client in respect to them.

"On the one hand, it is not necessary to establish that there has been fraud or imposition on the client; and, on the other hand, it is not necessarily void throughout ipso facto. But the burden of establishing its perfect fairness, adequacy, and equity is thrown upon the attorney upon the general rule that he who has bargained in a matter of advantage with a person placing a confidence in him is bound to show that a reasonable use has been made of that confidence; a rule applying equally to all persons standing in confidential relations with each other. If no such proof is established, courts of equity treat the cases as one of constructive fraud." 2 Story's Eq. §§ 310, 311.

"Whatever might be the proper view of the transaction had it occurred between parties dealing at arm's length, where no relations of trust or confidence exist, the law is well settled that no such transaction as the one found by the court can be sustained where it takes place between an attorney and his client. Attorneys are ministers of justice as well as courts, and justice will not be contented with half-hearted service on the part of her ministers, nor will she tolerate a bargain counter within her temple. If an attorney purchases his client's property, concerning which his advice is sought, the transaction is always viewed with suspicion, and the attorney assumes the heavy burden of proving not only that there was no overreaching of the client, but that the client acted upon the fullest information and advice as to his rights. In other words, the attorney must prove uberrima fides, or the transaction will be set aside by a court of equity. These principles are so well established as to need no citation of authorities, and to the credit of the profession, be it said, it is rarely necessary to invoke them." Young v. Murphy, 120 Wis. 49, 97 N. W. 496.

[7] Appellees contend additionally that, since both parties requested a directed verdict, the case was taken from the jury on the facts, and the judgment must be sustained if there be any evidence to support it.

Our views to the contrary of this contention are expressed in Citizens' Nat. Bank v. Texas Compress Co. (Tex. Civ. App.) 294 S. W. 331.

We find no error in the trial court's judgment in so far as Bell's appeal is concerned; but, since we are reversing the judgment establishing Wendlandt's trust deed lien, it will be necessary to set aside the personal judgment against Bell, pending final determination of Wendlandt's rights.

The trial court's judgment canceling the Ramirez-Bell deed is affirmed. The personal judgment against Bell is set aside, and that branch of the case remanded for further proceedings in accordance with our opinions in the two appeals. Bell will be taxed with the costs of his appeal.

Affirmed in part, and in part reversed and remanded.