**SCOTT et al. v. WEAVER et al.    (No. 7176.)**

Court of Civil Appeals of Texas. Austin.
Nov. 30, 1927.

Rehearing Denied Dec. 21, 1927.

**1. Cancellation of instruments ⬅47—Evidence held to show that agent did not fully disclose to principals all facts materially affecting conveyance to agent.**

In suit to cancel conveyance of oil, gas, and mineral interest in land to defendant, evidence *held* to show that defendant, who was plaintiffs' agent, failed to make full disclosure to ·them of all facts materially affecting the conveyance, entitling plaintiffs to cancellation of conveyance.

**2. Principal and agent ⬅48—Agency is fiduciary relationship, requiring agent's utmost loyalty and good faith.**

The relation of principal and agent is a fiduciary one, requiring the most perfect loyalty, utmost. good faith, strictest integrity, and fairest dealing on part of agent to principal.

**3. Principal and agent ⬅48—Agent must inform principal of every known material fact concerning transactions and subject-matter of agency.**

Loyalty to principal's ·interests requires that agent make known to principal every material fact concerning agent's transactions and sub-ject-matter of agency that comes to his knowledge, or is in his memory, in course of agency.

**4. Cancellation of instruments ⬅45—In principals' suit to cancel conveyance to agent, burden was on latter to show fairness of transactions and full disclosure of all material facts.**

In principals' suit to cancel their conveyance of oil, gas, and mineral interest in land to agent. burden was on latter to show fairness of his transactions and fact that he fully informed principals of all material facts relating to sub-ject-matter of agency.

Appeal from District Court, Caldwell County; M. C. Jeffrey, Judge.

Suit by Jim Scott and others against W. C. Weaver and others. Judgment for defendants, and plaintiffs appeal. Reversed and rendered.

C. F. Richards, of Lockhart, and Hart, Patterson & Hart, of Austin, for appellants.

E. B. Coopwood and Nye H. Clark, both of Lockhart, and Black & Graves, of Austin, for appellees.

BLAIR, J. As concerns .this appeal appellants sued appellee to cancel a conveyance to him of a one-sixteenth undivided oil, gas, and mineral interest in two acres of land owned by appellants in the Luling oil field, upon grounds of·fraud and concealment of material facts; it being alleged that appellee was their agent and attorney in fact, and occupied a position of trust and confidence in respect to the property conveyed at the time of the conveyance. Appellee denied the allegations of fraud and concealment of material facts.

A trial to a jury upon special issues resulted in a finding that appellee gave appellants the benefit of all his information and knowledge affecting all material facts. Upon the jury's verdict, judgment was rendered denying a cancellation of the instrument of conveyance, from which judgment this appeal is perfected.

[1] We sustain the contention of appellants that appellee, who occupied the relationship of agent, and was charged with the duty of making full disclosure of all facts materially affecting the conveyance, and·that the transactions conveying the property to him were fair to his principals, failed to do so under the uncontradicted evidence. And, since this conclusion disposes of the case, we will not discuss any of appellants' other propositions, but overrule them as being immaterial.

In 1923 appellants Jim Scott, a negro laborer, and his sisters, Sarah Sattiwhite, Lue Freeman, and· Lizzie King, negro farmer women, executed to an oil company a regular form oil and gas lease on the two acres of land in question, reserving the usual one-

eighth royalty interest. Neither of the appellants had any experience in the matter of oil production, and each had a very limited education. On May 25, 1923, an oil well producing 2,000 barrels per day was brought in on the land adjoining the two acres and 300 feet from it. Thereafter, between June 1 and 10, 1923, appellee W. C. Weaver, a white man, and an experienced business man, actively engaged at the time in buying and selling oil and gas leases and oil royalty interests in the Luling oil field, and with knowledge of the well on the adjoining land, sought appellants on three occasions to appoint him their agent to look after their interests in the oil lease theretofore given to the oil company. Appellee had never represented appellants, and, with the exception of Jim Scott, only knew them casually; but on June 10, 1923, by written instrument, they appointed appellee their agent and attorney in fact to take possession of the land, to collect and handle the money accruing to them under the oil and gas lease, to sell and convey royalty interest therein, to represent them generally in all contracts and transactions involving the said lease, and for which services appellee was to receive 10 per cent. of all money collected.

Shortly after the execution of the agency contract, some of the appellants became interested in selling one-half their royalty interest to a Mr. Kokernot, concerning which appellee testified as follows:

"Before I talked with Mr. Kokernot on Saturday evening, Lizzie King came down to the store, and had his name on a paper, and an offer of $900 for it. She wanted to sell it, and was very anxious for it to be sold, and I told her at that time I didn't think that was enough for it, but, if they wanted to sell it, I would come out and talk to her about it, and, if they all wanted to sell it, I would not do anything, unless they all wanted to sell. That was talking to Lizzie that I said that—that I would come out to her house, and she could talk to Lue and to Sarah, and, if they wanted to sell it, we would go out to San Antonio and see Jim about it."

On Monday or Tuesday following the above conversation with Lizzie, appellee went to her house, Lue being present, and the following conversation took place, according to appellee:

"Lizzie was very anxious to sell, and wanted to sell so badly, and she insisted that I should sell it, and I told her, if they wanted to sell it, she could talk to Sarah, and then we would go to San Antonio and see Jim about it. It was later on that I told them that I didn't think that was enough for it at that time, but, if they wanted to sell, that I did not believe that Mr. Kokernot was the man to sell to; he had the lease, and had talked to me about it, and, if they were going to sell, that I would buy it from them. If they would just as soon, I would take it at $900, less 10 per cent.—I would buy it."

Later in the same week appellee went again to see Lizzie and Lue, who informed him that Sarah was agreeable to the sale, and on Sunday following he took Lizzie and Lue, Sarah not going, in his car to see Jim at San Antonio. He left them at Jim's house for the purpose of talking the matter over, and later in the day he returned, and, according to his testimony, the following took place:

"They said they had talked the matter over, all of them, and that they wanted to sell it. I told them that I didn't think Mr. Kokernot was the man to sell it to, and I didn't think that was sufficient for it, but, if they wanted to sell it and were going to sell it, I would like to buy it with the $900, less my 10 per cent., and Jim said he would rather I would have it than anybody, and those papers were prepared and signed then—the royalty deed. * * *

"We talked about the matter considerably there at the house Sunday evening. We were there about an hour. We, of course, discussed it pro and con. I told them that Mr. Kokernot was not the proper man to sell to, and the price was too little, and advised them not to sell it, but, if they were determined to sell, I would give them the same price. This instrument was in blank form, and I filled it out myself. * * *

"During the conversation about this instrument, and signing the instrument, we all discussed the consideration, the $900. Lizzie and Lue and Jim all were present. There was something said about when this money was to be paid. Lizzie said at that time that she wanted her money now. I told them that I would have to get Albert Freeman to sign it before they could be paid, unless, as I thought, that Lue would get a divorce from her husband, and if she did, it would not be necessary for Albert Freeman to sign it, and Jim said that was all right, then, to go ahead."

The royalty deed was dated July 2, 1923, and named appellee's wife as grantee; but it is conceded that the conveyance was in fact to appellee. Appellee joined appellants as one of the grantors in his representative capacity. The consideration recited was $10 paid, but appellee gave the following as the reason for reciting only $10 consideration:

"As to why the consideration named in the deed is fixed at $10, most of those instruments are written for smaller amounts, and I made it for $10 consideration, and I told him also that maybe, if Albert knew the true consideration, he might not be willing to sign it; he had no interest in any of the money that was coming. It was his wife's separate property. I understood that they were separated, and were not living together. They were not divorced."

Sarah Sattiwhite and her husband, Lizzie King, a feme sole, and Lue Freeman, wife of Albert Freeman, each signed and acknowledged the deed on its date, July 2, 1923, before W. H. Muenster, a Caldwell county notary public. Jim Scott and his wife signed and acknowledged same on July 7, 1923, be-

fore a Bexar county notary public. Appellee signed and acknowledged the deed before W. H. Muenster, July 11, 1923, and filed it for record in Caldwell county on the same day, without obtaining the signature of Albert Freeman, and without paying, or offering to pay, any of the consideration other than the $10 recited in the deed, which he paid to Jim on the day the deed was signed. On July 14, 1923, Albert Freeman signed and acknowledged the deed before W. H. Muenster, and appellee filed it again for record without paying, or offering to pay, the consideration, although he had agreed to pay when he obtained the signature of Albert Freeman. Appellee paid Jim $54, which Jim claimed to be a loan, but appellee claimed to be a payment on the conveyance. Others of the appellants demanded payment, but he refused, on the ground that he wanted to get them all together in order that they might make an accounting between themselves as to the funeral expenses of their mother. Appellee admits neither he nor his wife had any money when he purchased the royalty interest, but that he had made arrangements with a cashier of a bank to pay for it. Appellee did not see appellants any more, except probably Lizzie and Lue, who on several occasions demanded pay for their royalty, until about August 11, 1923, when he found the four of them in a bank at Luling, executing some papers to Mr. Kokernot, at which time the following took place, according to appellee:

"I demanded to see his papers, and he was writing a deed for the royalty, and also revoking this power of attorney, and I talked to the negroes, and told them that, if they figured that Mr. Kokernot was their friend, and if they wanted to sell to him, they could go ahead and do it, but, if they wouldn't sell to him, that I would give them as much as Mr. Kokernot was giving them for it, which they claimed at that time was $1,800; and, if they didn't, I would just give them the $900 for it, just like I started out with, with the 10 per cent. off. That is about as far as I got; I left them after that."

Other than appellee's general conclusions that, "I never did keep anything from them," or "I told them all I knew," he never explained the conditions surrounding their land as to producing wells on adjoining property. He told them that Hardeman well No. 1, which was 300 feet from appellant's land, "was gassing a good deal and showing some oil," when, as a matter of fact, Hardeman No. 1 was a producer of 2,000 barrels per day even before appellee sought and obtained his appointment as agent for appellants. He told them that Hardeman No. 2, which was 150 feet from appellants' land, was being drilled, when as a matter of fact it came in for a producer of 3,000 barrels per day on July 12, 1923, two days before appellee ob-

tained the signature of Albert Freeman to the deed, and five days before appellee had the deed recorded the second time, which he did without paying, or offering to pay, the consideration agreed upon, and notwithstanding the deed which he caused to be executed and filed for record recited a consideration of only $10 as paid. Appellee "knew, of course, that the wells had been drilled previous to that." By recording the deed without paying the true consideration, he put his principals at a great disadvantage, in that they were compelled to rely upon oral testimony to overcome the recitation of $10 consideration as paid and contained in the deed. In other words, the deed recited a completed transaction, when as a matter of fact the consideration had not been paid, and appellee violated his agreement by failing to pay the consideration when he obtained Albert Freeman's signature, and then placed his principals at a great disadvantage by compelling them to show the true consideration by parol evidence.

On about August 14, 1923, appellee tendered his checks to appellants in payment of the $900 consideration, less 10 per cent.; but they refused them, and brought this suit to cancel the deed or instrument to appellee. Appellee tendered $900, less 10 per cent., into court on the trial.

[2] The rule of law governing appellee under the facts is as follows:

"The relation of principal and agent is fiduciary, requiring the most perfect loyalty and the utmost good faith, the strictest integrity, and the fairest dealing on the part of the agent to his principal." Hahl v. Kellogg, 42 Tex. Civ. App. 636, 94 S. W. 389; National Surety Co. v. McCutcheon (Tex. Civ. App.) 270 S. W. 1062; Parks v. Schoellkopf (Tex. Civ. App.) 230 S. W. 709.

[3] And as stated in 2 C. J., 714:

"Loyalty to his principal's interests requires that an agent shall make known to his principal every material fact concerning his transactions and the subject-matter of the agency that comes to his knowledge, or is in his memory, in the course of the agency."

[4] Appellee admitted in both his pleadings and evidence the confidential or fiduciary relation existing between the parties at the time he obtained the conveyance to himself, and the burden rested upon him to show the fairness of his transactions, and that he had fully informed his principals of all material facts relating to the subject-matter of his agency, which he did not do; but the contrary is shown by his own acts, conduct, and testimony as above detailed. Goar v. Thompson, 19 Tex. Civ. App. 330, 47 S. W. 61; Cooper v. Lee, 75 Tex. 114, 12 S. W. 483; Bell v. Ramirez (Tex. Civ. App.) 299 S. W. 655 (writ of error refused).

We reverse the judgment of the trial court

and here render judgment for appellants, canceling the conveyance of the one-sixteenth undivided oil, gas, and mineral interest in the land involved, the record showing that this was the second trial of the cause, and no doubt the cause has been fully developed.

Reversed and rendered.