### BAIRD et al. v. LAYCOCK et al.
### No. 4963.

Court of Civil Appeals of Texas. Texarkana.

April 24, 1936.

Rehearing Denied April 30, 1936.

Edgar Wright and F. D. Wear, both of Paris, for plaintiffs in error.

Cunningham & Lipscomb, of Bonham, and Allen Reed, of Dallas, for defendants in error.

SELLERS, Justice.

Lillian Baird and her husband, H. C. Baird, brought this suit in the district court of Fannin county against Allen Reed and R. C. Laycock to cancel a deed by plaintiffs to Allen Reed dated August 28, 1930, conveying to him an undivided one-half interest in 66½ acres of land. Second, they sought to cancel a deed executed by H. C. Baird, administrator of the estate of Eugene Baird, deceased, dated August 26, 1933, conveying to Allen Reed the other undivided one-half interest in the same land. Third, they sought to cancel a deed executed by Allen Reed to defendant R. C. Laycock conveying all the 66½ acres of land. This deed was dated October 10, 1933. Cancellation is also sought of a vendor's lien note executed by Laycock to Reed as part consideration for the land, and a deed of trust executed by Laycock securing the payment of said note.

The first deed is alleged to be invalid for the reason that it was intended by the parties to be a mortgage to secure Allen Reed in the payment of an attorney's fee due him by the Bairds for services to be rendered them in the administration proceedings pending involving the title to the entire 66½ acres of land, which land is alleged to be their homestead. This deed was also alleged to be invalid for the reason that Lillian Baird never acknowledged the same as required by law for the conveyance of her homestead. The second deed was alleged to be invalid because fraudulently secured by Allen Reed, the attorney of the ignorant administrator. The instruments between Allen Reed and Laycock were sought to be canceled because Laycock bought with knowledge of the invalidity of the deeds to Allen Reed.

The case was tried to a jury, and at the close of the evidence the court instructed a verdict for defendants and entered judgment accordingly. From this judgment the plaintiffs have appealed by writ of error to this court.

This appeal presents for review the sufficiency of the evidence to raise issues of fact on the material allegations of plaintiffs in error's cause of action. The record discloses evidence to the following effect: The land involved in this suit is 66½ acres of the John H. Wilson survey located in Fannin county. It was purchased in 1901 by Eugene Baird and his wife, and constituted their community homestead from the time it was purchased until his wife's death in 1909. After her death, he continued to reside on the place until his death in 1929. They only had one child, to wit, H. C. Baird. H. C. Baird married in 1906, and he and his wife, Lillian Baird, moved on this place immediately after they were married, and continued to live on the place with H. C. Baird's father and mother until his mother's death and until about two or three years before his father's death, when they moved to Honey Grove, a few miles away. But they continued to claim the place as their home and acquired no other property. The next day after his father's death H. C. Baird and his wife moved back on the place and continued to live there until this litigation was instituted. A creditor of Eugene Baird made application to the probate court of Fannin county to be appointed administrator of Eugene Baird's estate. H. C. Baird employed a Mr. Warren as his attorney to contest the application of the creditor for letters of administration and to have himself appointed as such. On a hearing the probate court appointed H. C. Baird as administrator, and he duly qualified as such. The whole of the 66½ acres of land was listed as a part of the estate of Eugene Baird. This appointment of H. C. Baird as administrator took place in 1929. Some time thereafter the attorney, Warren, was discharg-

ed, and in April, 1930, H. C. Baird went to the office of defendant Allen Reed to employ Reed to represent him in the administration proceedings. Baird was accompanied to Reed's office on this occasion by Ed Bailey, who testified as follows:

"Q. Now, what, if anything, was said by and between you and Henry and Allen Reed with reference to employing Allen Reed to represent Henry in a case pending in the County Court? A. Well, Henry wanted to know what he could do about it, several of them were suing him on the case and Mr. Reed told him that if he would deed him the place, half of the place, that he would save the other half for him and give him a chance to redeem it, if he ever got to where he could, and his wife asked me about it after we come out.

"Q. State whether or not at that time anything was said by Mr. Reed in regard to keeping one-half of the place out of court proceedings? A. Yes, he was to keep one-half of it out.

"Q. Well, now, what, if anything, did Mr. Reed say in regard to how he would keep this half out of the court proceedings? A. Well, he said he would, if he could not keep it out, he would just extend it on and on in court and wear it out in court.

"Q. Well, was there not something said about the other half of the place? A. Yes, the whole place.

"Q. Well, now, what was said about the other half, how was that going to be, of Mr. Reed said anything with reference to how he would keep that half out of these court proceedings? A. Well, I don't remember without he meant the whole place at the time, keep the whole thing out of court and give him a chance to redeem it when he got to where he could.

"Q. Give who a chance? A. Henry Baird.

"Q. What was he to redeem it from? A. From him.

"Q. From Mr. Reed? A. Yes, sir.

"Q. Now what for? A. For his attorney's fees, his charges, Henry was broke and he didn't have no money and it was for that purpose.

"Q. Well, what, if anything, was said by Mr. Reed to Henry in regard to the purpose for which the land, half of the land should be deeded to Mr. Reed, what did Mr. Reed say the purpose of that was for? A. It was for attorney fees, for what he was charging to save the land for him.

"Q. How much of the land, if any, did Mr. Reed say that he was going to save for these people? A. Well, I don't know, it was all of it, I suppose.

"Q. Well, now, I don't want what you suppose, just state whether or not he said he could save all of it or not? A. Well, he said he could save half of it for him.

"Q. Well, now, what was said about the other half? A. Well, he said he would take half of it and then he would deed it back to them if they ever got able to pay him his attorney's fee.

"Q. What, if anything, was said about the amount of attorney's fees that Mr. Reed was to charge Henry? A. Well, it was just a reasonable amount. If there was ever anything said about the exact amount that he was to charge, why, I never heard it."

Lillian Baird testified in substance as follows: "I remember when Henry asked me to go with him to Mr. Reed's office for purpose of getting me to execute some kind of an instrument. My husband told me it was a contract for the fee we owed Mr. Reed. We went in April, 1930. No one in the office but Mr. Reed. Mr. Reed said, 'I have some papers I want you and your husband to sign.' He didn't read anything to us, not anything. I did not read it, he did not tell Henry to read it. A man was over in the South office. Well, Reed called to the man to the door and asked him if he would take this boy and girl's acknowledgment and the man said yes. He went back and sat down. Henry and I both signed the instrument. We first signed the instrument and went on down the steps. If there was any notary public there I did not see them. No notary read or explained the instrument to us, or told us what it contained. Henry was not asked to go out of the room and we both were in the same room all the time. No one came into the room to take the acknowledgment or explained the deed before we signed it, or told us what it was. Mr. Reed did not say anything. If I had known I was signing a deed deeding Mr. Reed an undivided half interest in our homestead for $800 he was supposed to be charging as a fee I would not have signed it. If I had known it was a deed I would not have signed no deed to nobody. I went to Mr. Reed's office to sign a contract for a fee we owed Mr. Reed. 'Well, I signed a contract for him to have a lien on the land, half

of the land, until we could get him paid the small fee we owed him.' My husband told me what kind of an instrument I was to sign."

There is evidence that plaintiffs relied upon, and placed absolute confidence in, their attorney, Allen Reed, relying upon him to attend to all the matters in connection with the administration and to carry out his contract with them. The deed made by plaintiffs to Allen Reed was not recorded until September 25, 1933. The defendant Allen Reed, as attorney for the administrator, caused the inventory and appraisement to be corrected in order to show that only one-half the land involved belonged to the estate of Eugene Baird; the other one-half being inherited by H. C. Baird as heir of his mother. Reed prepared and filed all the papers in connection with the sale to him by Baird as administrator of the undivided one-half interest in the land being administered by the probate court. The application to sell this interest in the land was made to the court on May 10, 1933. The application was granted on August 14, 1933, and the administrator authorized to sell the land at private sale for cash. Administrator filed report of sale to Allen Reed for a cash consideration in the sum of $385.95. None of the cash consideration was ever paid to the administrator by Reed. The report of sale was in all things approved by the probate court. Deed from administrator to Reed was executed August 26, 1933, and recorded September 25, 1933.

Allen Reed conveyed the whole tract to R. C. (Ralph) Laycock on October 10, 1933, for the sum of $400 cash and a vendor's lien note for $350, which note was secured by deed of trust lien on the land. W. M. Laycock is the father of defendant R. C. Laycock, and was authorized by R. C. Laycock to purchase the land for him. The defendant R. C. Laycock, with other members of his family, made two trips to the Baird home before he purchased the land, and the testimony of Lillian Baird as to what took place on each occasion is as follows:

"I know Mr. R. C. Laycock who bought this property, I know Virgil Laycock, W. M. Laycock, the father of R. C. Laycock and Virgil Laycock, R. C. Laycock's wife, and his mother. Ralph come out to our place, the first time he come was sometime in August, as well as I can remember, it was sometime in August, 1933. There was Mr. Ralph, Virgil, Grady Rasbury and the old man Bill Laycock came with him and Ralph's wife,

and Virgil's wife. That was sometime in August.

"Q. Now, what happened there at that time, what was said to you, if anything, by Ralph or any of the parties? A. Well, it was on Sunday morning, they just drove up and all of them got out and the two women they set down on the porch and the menfolks they got out of the car and just went every direction across the farm looking at it; well, after they had done walked across the farm and looked all they wanted to, well, they all come back, so old man Bill Laycock he asked was there anything against the place and I says, 'No, not a thing in the world against the place no more than taxes and a small fee that we owe Allen Reed;' well, they all hushed then for a while and so the women they asked did I care if they looked at the house and I told them no, I didn't care if they looked at it. Well, the two women they went in and looked, and so one, I don't remember which one it was, whether it was Miss Lois or Miss Pauline, says, 'Well, it sure is a nice house,' and the other one spoke and says 'It is.' Well, that was all that was said at that time. That was in August. The next time was about two weeks, or something like three, they come back again. The second time there was Ralph, Virgil and Ralph's wife, Miss Lois and his mother. At that time Virgil asked me, says, 'Lillian, do you care if Mama and Lois look at the house?' And I says, 'Have you all bought it?' And he says, 'No, we can't get the papers fixed up on it,' and I says, 'Well, if you hain't got them fixed you won't get them fixed because I am not going to deed my home to anybody.'

"Q. Well, was anything else said? A. And so I don't know whether the women spoke first or whether Virgil spoke first, but anyway Virgil said, he stood with one foot up on the east end of the front porch and said, this way, says, 'You better watch the crooked ―――― because he is going to beat you out of it if he can,' so Mrs. Laycock says, 'Well, Lillian, we don't want you to think we are trying to beat you out of it; Mr. Reed says he is in possession and he is going to sell, and of course if anybody buys it, we want to buy it.' And I says, 'Well, there hain't nobody going to get it,—Ralph, Virgil, you nor your daddy nor anybody else hain't going to get it—I hain't going to deed my home to nobody!' That was all that was said. That was the last time they were there. There was not a word said by

Henry. It was Sunday each time they were there.

"Q. Now state whether or not Ralph Laycock was there and heard what you said in reply to the question that Virgil asked? A. Yes, sir.

"Q. And the question Mr. Laycock asked the first time? A. I didn't understand you.

"Q. I say, Mr. Ralph Laycock was there both times? A. Both times."

The land at the time Reed got the deed from the Bairds was valued at $35 per acre. The record discloses that Reed performed no service for the administrator other than preparing the papers for the sale of the land to himself and represented the administrator in the contest of one claim in the justice court, which resulted in a judgment against the administrator. The case was appealed to the county court and to the Court of Civil Appeals, where the judgment against the administrator was affirmed. The above is only a very brief summary of the evidence contained in the statement of facts which covers nearly 400 pages.

■ It is our opinion that the evidence as a whole must be held to present an issue of fact for the jury's determination as to whether the deed from H. C. Baird and his wife to Allen Reed was intended as a mortgage to secure a reasonable attorney's fee, and also that the deed was not acknowledged in accordance with the statute for the conveyance of a wife's homestead.

■■ With reference to the conveyance by H. C. Baird as administrator to Allen Reed, we are of the opinion that it comes within the general rule well recognized by the courts of this state that a sale by a client to his attorney of land in litigation is presumed fraudulent, and the burden is on the attorney to show the fairness of the transaction. Bell v. Ramirez (Tex.Civ. App.) 299 S.W. 655, 658. In this case Judge McClendon held: "The well-established rule that the relation of attorney and client is one of uberrima fides rests upon the highest considerations of public policy, and agreements between them in the course of the relation are prima facie presumed to be fraudulent, the burden to show them otherwise being cast, as a matter of law, upon the attorney." If we are correct in holding the above rule applicable, then there can be no question but that the issue of fraud in securing the deed from H. C. Baird as administrator to Allen Reed should have been submitted to the jury.

■ We also sustain plaintiff in error's contention that the evidence raises an issue of fact as to whether defendant in error Laycock was an innocent purchaser for value, and that plaintiffs in error were entitled to have submitted to a jury the issue whether under the circumstances he was charged with the duty of inquiry. The evidence shows that defendant in error Laycock before he purchased the land knew plaintiffs in error, knew that they had lived on this place a long time, using it as a home. In August before he purchased in October, he, with other members of his family, went out to inspect the place and found plaintiffs in error in possession, and was advised by Lillian that there was nothing against the place except the taxes and the small fee they owed Allen Reed; that she was not going to convey her home to anybody. He knew that Reed's deed, which was executed in August, 1930, was not recorded; that at that time Reed had no deed from the administrator to the other undivided interest in the land, although he was negotiating with him to buy it. He also knew that plaintiffs in error were ignorant negroes, and, according to the evidence, Laycock's brother Virgil in his presence told plaintiffs in error on their second visit to the farm that they had better watch Reed, for he would beat them out of the place if he could. These circumstances, it seems to us, are sufficient to place a reasonably prudent person on inquiry. Ramirez v. Bell (Tex.Civ. App.) 298 S.W. 924; Williams v. Daniels (Tex.Civ.App.) 4 S.W.(2d) 189. Defendants in error rely upon the case of Eylar v. Eylar, 60 Tex. 315, wherein the rule was established that a purchaser may rely upon a deed from grantors in possession and not make further inquiry as to their title. But this rule has no application where the purchaser has actual notice of a title of those in possession or of facts sufficient to place upon the purchaser the duty of making inquiry of those in possession of their title to the land. Ramirez v. Bell, supra.

■ It is contended by defendants in error that under no view of the case could plaintiffs in error recover that part of the land purchased from the administrator, for the reason that the administrator was not a party to the suit. Our investigation of the authorities leads us to the conclusion that

an heir to property being administered always has a right to sue to recover property fraudulently conveyed by the administrator. Of course, if the heir is successful, the title is revested in the heir subject to the administration proceedings. Fisher v. Wood, 65 Tex. 199; Kreis v. Kreis (Tex.Civ.App.) 57 S.W.(2d) 1107; McCampbell v. Durst, 73 Tex. 410, 11 S.W. 380. The Fisher v. Wood Case also holds that the suit may be brought in the probate court where the administration is pending, or in the district court. Johnston et al. v. Stephens et al., 121 Tex. 374, 49 S.W.(2d) 431.

The judgment of the trial court is reversed and the cause remanded.