## SOUTHLAND LIFE INSURANCE COMPANY V. ELIZABETH STATLER ET AL.

No. 7934. Decided June 24, 1942.
Rehearing overruled July 22, 1942.
(163 S. W., 2d Series, 623.)

*House & Irvin,* of San Antonio, *John W. Wilson,* of Cotulla, and *Malone, Lipscomb, White & Seay,* of Dallas, for plaintiffs in error.

The Court of Civil Appeals erred in holding that a contract of insurance came into effect when the applicant required that the policy be issued, be manually delivered and accepted, or that the first premium be paid at the time of making application, when the undisputed evidence showed that the policy was never issued, delivered nor accepted by the insured, and that the first premium was not paid at the time the policy was applied for. United Fidelity Life Co. v. Handley, 126 Texas 147, 86 S. W. (2d) 201; Southland Life Ins. Co. v. Lawson, 157 Texas 399, 153 S. W. (2d) 953; Rushing v. Manhattan Life Ins Co., 224 Fed. 74; Steele v. Glenn, 61 S. W. (2d) 810; Texas & Pac. Ry. Co. v. Poe, 131 Texas 337, 115 S. W. (2d) 591; 17 Tex. Jur. 135; 43 Tex. Jur. 891.

*L. B. Cooper*, of Cotulla, *Elmer Ware Stahl* and *A. R. Sohn*, both of San Antonio, for defendant in error.

MR. JUSTICE CRITZ delivered the opinion of the Court.

This suit was filed in the District Court of LaSalle County, Texas, by Mrs. Elizabeth Statler, surviving widow of William B. Statler, deceased, and Stewart Statler, surviving son of William B. Statler, deceased, and Mrs. Elizabeth Statler, against the Southland Life Insurance Company, a life insurance corporation duly organized under the laws of this State, to recover on a life insurance policy, in the sum of $15,000.00, alleged to have been issued by the Southland Life Insurance Company, hereinafter called the Company, on the life of William B. Statler, and payable to his estate. Trial in the district court without the aid of a jury resulted in a judgment for the Statlers, and against the Company, for $26,774.41, with six per cent. interest from its date. This judgment was composed of the following elements:

1. The sum of $14,815.07, which is the face of the policy less the amount of the first quarterly premium, which was returned to William B. Statler during his lifetime, as will later appear.

2. The sum of $1,777.80, which represents twelve per cent. penalty on the above sum of $14,815.07.

3. The sum of $3,481.54, which represents six per cent. interest on $14,815.07 from October 21, 1936, to the date of the judgment, October 1, 1940.

4. The sum of $6,700.00, which represents a reasonable attorney's fee for the attorneys for the Statlers.

On appeal by the Company, the Court of Civil Appeals at El Paso affirmed the judgment of the district court, except it reduced the attorneys' fee to $5,000.00. No one complains of this reduction, or the manner in which it was accomplished. The Company brings error.

The Company is what is generally termed an old line insurance company, duly incorporated under the laws of this State. On the first day of January, 1935, the Company entered into a written contract with one Hugh M. MacGregor. By the terms of this contract MacGregor was constituted "District Manager" for the Company in the group of counties named therein. Since the extent of MacGregor's authority as agent of this Company becomes very important in the decision of this case, we deem it advisable to set out his entire contract of employment. It is as follows:

### "DISTRICT MANAGERS CONTRACT.

"1. This agreement is made between SOUTHLAND LIFE INSURANCE COMPANY, (hereinafter called the Company), and Hugh M. MacGregor, (hereinafter called the District Manager), and supersedes all contracts heretofore made between the parties.

### "DUTIES.

"2. The primary duty of the District Manager shall be the appointment by him of suitable and trustworthy agents on Company forms within the territory hereinafter specified; and to work with and assist any agents of the Company already in that territory and the agents appointed by such District Manager in the production of business. The District Manager understands that the Company expects him to give his first attention to the securing of producing agents in the territory hereinafter specified, especially in that part in which the Company may not now have producing agents. The District Manager agrees to keep in touch with all agents in his territory by correspondence and by calling on them at reasonable times and intervals, and give them assistance in their work.

"3. The District Manager will report at once to the Company any neglect, inability or refusal on the part of an agent to produce business, and such contract shall at once be sus-

pended or cancelled and it shall be the duty of the District Manager to at once appoint a new agent in that particular vicinity.

"4. The District Manager agrees to devote his entire time, skill, attention and ability to these duties, and to perform all other such acts and duties as may be required by him by the Company.

### "TERRITORY.

"5. The District Manager's territory shall consist of the counties of: Atascosa, Bandera, Bee, Bexar, Dimmit, Edwards, Frio, Karnes, Kerr, Kinney, LaSalle, Live Oak, McMullen, Maverick, Medina, Real, Uvalde, Wilson and Zavalla.

"6. The District Manager shall make his residence in the City of San Antonio, County of Bexar, State of Texas, and work his territory from that point, but the Company can, at its option, change his place of residence.

### "COMPENSATION.

"7. The Company agrees to pay the District Manager a salary of $250.00 per month, payable at the Company's Home Office semi-monthly on the 15th and last days of each calendar month while this agreement is in force.

"8. The District Manager agrees to furnish his own automobile while traveling in his territory in the performance of his duties, and agrees to carry liability insurance on such car so as to hold both himself and the Company harmless from any claims for damage, and to deposit such policy with the Company. The Company agrees to allow and pay the District Manager $50.00 per month on account of such car. The Company also agrees to pay for all meals and hotel bills actually incurred by the District Manager while traveling in his automobile in his territory in the performance of his duties hereunder.

"9. The District Manager shall submit a full account of all such expenses each week.

"10. The District Manager agrees not to use the railroad, or bus lines, in traveling, except with the consent of the Company, and, in that case, the Company will pay such fare.

"BONUS.

"11. In addition to the salary, the Company agrees to pay the District Manager a bonus if the District Manager shall qualify therefor, under the following terms and conditions:

"12. A quota shall be established for the first calendar year, computed as follows: The total amount of salary, automobile allowance, traveling expenses, office expenses—if any—paid the District Manager during such calendar year, less the amount allowed by the Company on personal business as stated below, shall be multiplied by two hundred (200) and the result shall be the quota for such calendar year; provided such quota shall consist only of issued, delivered business, less the amount thereof 'not taken.'

"13. For the second calendar year, the quota for that year shall be computed in the same manner as for the first calendar year expect that the total amount of salary and expenses of the the District Manager, less his deduction shall be multiplied by 225 instead of 200, and the bonus—if any—for the second calendar year shall be computed and paid on March 1st the following year, or as soon thereafter as practicable.

"14. For the third calendar year the quota for that year shall be computed in the same manner as for the first calendar year except that the total amount of salary and expenses of the District Manager, less his deduction shall be multiplied by 250 instead of 200; and the bonus, if any, for the third calendar year shall be computed and paid on March 1st, the following year or as soon thereafter as practicable.

"15. Should the District Manager produce by his own personal efforts (unassisted by any agent) and handle in his own name, any issued, delivered and paid for business during the calendar year, his expense account for that purpose of computing such quota shall be deemed to be reduced by commissions on the first year's premium according to the schedule of first year commissions being paid by the Company at the time the business is produced. Such commissions shall never be deemed to have been earned by said District Manager and shall in no sense be deemed as owing to him by the Company but shall be used only for the purpose of calculating said quota, and the amount of his expenses shall be deemed to be reduced by the amount of such commissions so credited, and the annual

quota to be computed as above set out shall be lessened accordingly as said expense account may be so reduced by such credits.

"16. For all issued and delivered business less 'not taken' produced in the territory of such District Manager during each calendar year the Company will pay the District Manager a bonus equal to one dollar ($1.00) for each One Thousand Dollars ($1,000.00) of such business so produced over and above the annual quota for that year.

"17. In determining the volume of the District Manager in the above specified territory and to determine whether or not he made his quota, such District Manager shall be credited with all issued and delivered business, less the amount hereof returned 'not taken,' of all agents in his territory provided that Five and Ten Year Term insurance shall be counted at one half its face value, and the policies payable otherwise than in a lump sum shall be counted at their computed value. It is also understood that any issued, delivered and paid for business produced by any agent of the District Manager outside of the above specified territory shall be counted in the volume of the District Manager under whom the agent is working.

"18. On March 1st, the following year (or as soon thereafter as practicable) the Company will compute the quota of the District Manager and Pay.

"CANCELLATION.

"19. This contract may be cancelled by either party giving the other fifteen (15) days notice in writing. The depositing of a notice of cancellation in the mails, duly stamped and addressed to the other party at the last known Post Office address, shall be sufficient to comply with this provision. All salary, bonuses and other compensation shall cease on the date of such cancellation, but if the contract is cancelled by the Company, the bnous, if earned, will be paid, the same to be computed by multiplying by 200, 225 or 250, as the case may be, by the net cost at time of cancellation. If the contract is cancelled by the resignation of the District Manager, no bonus will be due or payable at the time of resignation.

"20. This contract contains the entire agreement of the parties, and if there have been any prior or contemporaneous

oral agreements or representations not included herein, it is understood that all rights under such prior or contemporaneous oral agreements or representations are waived. This contract may not be altered, amended or added to except in writing duly signed by one of the executive officers of the Company at its Home Office. No other representative of the Company has any authority to alter, add to or amend any of the terms and conditions of this contract.

"21. This agreement shall be effective as of January 1st, 1935, and shall (subject to prior cancellations as above set out) govern the relations of the Company and the District Manager for the first three calendar years."

A reading of the above contract will demonstrate that it contemplated that MacGregor should appoint soliciting agents for this Company in the territory named therein, and that he should have general supervision over such agents. Such contract, however, did authorize MacGregor to "produce by his own personal efforts (unassisted by any agent) and handle in his own name, any issued, delivered and paid for business * * *." To our minds, this authority clothed MacGregor with authority to act as a soliciting agent in his own name; but his authority in such instances was certainly no more than that of any ordinary soliciting life insurance agent. He had authority to solicit business and take applications for life insurance, and send same in to the Company. He had no more authority to bind the Company by oral agreement than any ordinary soliciting agent.

On March 8, 1936, MacGregor, acting as soliciting agent of this Company, secured from William B. Statler an application for two alternate policies of life insurance, one for $10,000.00 retirement policy, and the other for a $25,000.00 life expectancy policy. This application, generally speaking, is in the usual form of an application for life insurance with an old line life insurance company. It contains, among others, the following provisions:

"In behalf of myself and of every person who shall have or claim any interest in any policy issued in consequence of this application, consisting of Sections One and Two, I hereby agree: (1) that all statements and answers contained in this application are full, complete and true as therein written; (2) that

the policy or policies *issued* in consequence thereof shall constitute the entire contract of insurance and the Company shall not be bound in any way by any promise or statement made by or to any agent, or other person, unless such promise, statement or information be reduced to writing, and submitted to the Company and made a part of the contract; (3) that there shall be no liability hereunder until a policy shall be *issued* and manually *delivered* to me and accepted by me while in good health, and the first premium thereon actually paid, during my lifetime, provided, however, that if said premium is paid in full to said Company's agent at the time of making this application, and if the Company at its Home Office in Dallas, Texas, shall *issue* a policy on the plan applied for herein, then the insurance (subject to the provisions of the policy applied for) shall be effective from the date of the Company's approval of this application; * * * (5) that the Company shall have sixty (60) days from the receipt of this application at its Home Office within which to pass upon it, and if the same shall not be accepted within said time (or if a policy upon a modified or different form from that applied for shall not be issued within such time) it shall be conclusively deemed that this application is declined." (Italics ours.)

It appears that William B. Statler was duly examined by the Company's medical examiner, and thereafter was duly accepted by the Company as an insurance risk. The Company, however, was unwilling to insure Statler for more than $15,-000.00. The Company on March 23, 1936, issued two policies on the above application. One of these policies was for $10,-000.00, as applied for, and one was for $15,000.00 life expectancy policy. These policies were forwarded to MacGregor, with instructions to deliver one of them, but not both.

It appears that a Mrs. M. D. Riney was a soliciting agent of this Company in MacGregor's territory. Although MacGregor solicited the Statler insurance, he arranged for Mrs. Riney to get the commission on same. This arrangement is not criticised. After the Company had received the Statler application and medical report, and after it issued the two policies above described, it sent both of them to MacGregor, with the following letter:

"Dallas, Texas
March 23rd, 1936

cc to H. M. MacGregor,
601 Majestic Bldg.,
San Antonio, Texas.

Mrs. Martha B. Riney,
209 Donaldson,
San Antonio, Texas.

Dear Mrs. Riney:

Policy Nos. 185157-8
William B. Statler.

Our Risk Committee was unable to approve application for an amount in excess of $15,000.00. We have therefore declined $10,000.00 of the application on the life expectancy 28 year Term Plan.

It is understood that only one of the above policies is to be delivered. The undelivered policy to be returned for cancellation.

If policy Number 185158 is delivered, you are to have the amendment completed and return it to us.

Yours very truly.
(Signed) Jeff D. Bronson
SOUTHLAND LIFE INSURANCE CO."

On May 8, 1936, MacGregor took the two insurance policies sent him, with the above letter, to Big Wells, where Statler lived, and there had an interview with Statler. At this interview Statler informed MacGregor that he did not want and would not take the $10,000.00 policy, bearing Number 185157, but that he would accept the life expectancy policy for $15,-000.00, bearing Number 185158, at a later time, and if redated and provided the premium payments were put on a quarterly basis, instead of an annual basis as provided in the policy tendered. The $15,000.00 policy as issued and tendered was, generally speaking, in the usual form of a life expectancy policy. Among other things, it contained the following provisions:

"This policy shall not be effective unless manually delivered to the insured while in good health and in insurable condition;

provided, however, that if the first premium was paid to the Agent at the time of making application herefor, the insurance under this policy shall be effective from the date of the Company's approval of the application at the Home Office."

"No agent is authorized to modify this policy or in the event of lapse to reinstate it or to extend the time for paying a premium. Only the President, a Vice-President, Secretary, Actuary, or Assistant Secretary has the power on behalf of the Company to modify this or any contract of insurance and then only in writing at the Home Office of the Company, and the Company shall not be bound by any promise or representations heretofore or hereafter made by any other person."

The record shows that MacGregor informed Statler, in the interview above mentioned, that the $15,000.00 policy could be reissued as of a later date, and that his wishes with reference to paying premiums quarterly, instead of annually, would be complied with.

After the above interview MacGregor returned both the above-mentioned policies to the Company at its Home Office in Dallas, Texas, with the following letter:

"8 May 1936

Mr. Jeff D. Bronson,
Southland Life Insurance Company,
Dallas, Texas.

Policies Nos. 185157-185158 - William B. Statler.

Dear Jeff:

I am returning herewith two policies—No. 185157 and No. 185158.

The Retirement Income Policy No. 185157 I ask to have this policy cancelled. When these two policies were issued only one could be delivered. I have just returned from the Winter Garden section where they have suffered a very distastrous hail storm and there's no market for the onions.

On policy No. 185158 Life Expectancy I am asking that this policy be rewritten on the quarterly basis and ask that in reissuring this you give me the very last day on dating this

policy from the time that the medical was made. I am asking this as every thirty days that I can get on this contract will help me very materially to deliver this policy.

Mr. Statler agreed to take this life expectancy on the quarterly basis but asked that as a favor to him that he will not have to pay for it before the 15th of June, or the first of July, and if you will date the new policy as far away from the new medical as is practical, I'll appreciate it and return same to me for delivery.

Kindly get Mr. Statler's policy back to me just as soon as you can in order that I may make this trip again to Big Wells to see Mr. Barker and at that time can deliver Mr. Statler's policy.

Very truly yours,

H. M. MacGregor,

District Manager."

When the Company received the above letter, with returned policies from MacGregor, it wrote and mailed to MacGregor the following letter:

"Dallas, Texas.

May 14, 1936.

Mr. Hugh MacGregor,
District Manager,
San Antonio, Texas.

In re: Policies Nos. 185157-8, Wm. B. Statler.

We are in receipt of your letter of the 8th, returning policies numbers 185157 and 185158, William B. Statler, 185157 for cancellation and 185158 to be reissued as of a current date.

You state that the applicant will not be able to pay for the insurance before the 15th of June, or the 1st of July and that you would like to have the new policy dated as near these dates as the medical examination will permit. Inasmuch as evidence of health would be required in case the policy is not delivered by the 23rd of this month, it has occurred to us that it might be best to have evidence of health submitted on or about June 15th and the policy reissued at that time because it seems from your letter that it will be impossible to effect delivery by the 23rd, which is the limit of time that can be allowed on the medical examination we now have. However, if you believe the

policy can be delivered by the 23rd and you will notify us to that effect, we will be glad to issue it and send it to you for delivery.

Very truly yours,
(Signed) P. N. Thevenet,
Vice President and Secretary."

MacGregor received the letter last above-mentioned in due time, and about May 19 or 20, 1936, went to Big Wells and again interviewed Statler. In this interview Statler was shown the above letter from the Company to MacGregor. Also, in this interview MacGregor informed Statler that if he, Statler, would then pay to him, MacGregor, a quarterly premium on the $15,-000.00 policy, a policy of life insurance for that sum on the life expectancy plan would then be in effect, and would be issued as of that date. Acting on such oral statement or agreement, Statler then and there delivered to MacGregor a check, payable to Mrs. Riney, for $73.95, representing the first quarterly premium on a policy of life insurance which Mac-Gregor agreed would be issued and delivered as of date of this interview. At the time of this interview MacGregor had no policy in his possession to be delivered to Statler, and no policy of the date or premium payment terms agreed on had ever been issued, or was ever issued, by the Company.

It seems that after MacGregory received from Statler the check for $73.95 under the circumstances above detailed, he turned same over to Mrs. Riney. Mrs. Riney did not notify the Company of the receipt of such check, and did not remit the net proceeds thereof, and the Company did not discover that MacGregor had accepted such check until about June 11, 1936. On that date MacGregor wrote the Company the following letter:

"11 June 1936

Mr. P. N. Thevenet, Vice President & Secretary,
Southland Life Insurance Company,
Dallas, Texas.

Policy No. 185158 - William B. Statler.

Dear Mr. Thevenet:

About the 20th of May I went down to Big Wells and caught Mr. Statler before he left for Farmersville.

He at that time gave me a check for the quarterly premium, which I turned over to Mrs. Riney.

I did not have a health certificate with me at the time and I have mailed him at Farmersville a health certificate which I do not recall whether he sent in direct to you or not, but I wish that you would send the policy to me as at the time that I saw Mr. Statler and collected the check for the quarterly premium, he was in perfect health.

I misunderstood your letter as I thought that· the policy would be reissued and delivered to me not later than the first of June. I will thank you to see what is holding this transaction up.

In order that I may facilitate the delivery of this contract, I suggest that you send the policy to me as we have sent him two health certificates by mail to Farmersville and up to date have received no reply.

Very truly yours,
H. M. MacGregor,

HM/ed                                          District Manager."

Statler never sent to the Company any health certificate.

After the Company had received notice of the check transaction between Statler and MacGregor, and after it had received the above letter from MacGregor, several communications passed between them. It would render this opinion too long to set them out in full. The substance of such communications was that the Company would not consider reissuing the Statler insurance policy on the original examination, but would require further health or medical report. In this regard, it seems that the Company made several efforts to have MacGregor secure a further health report from Statler.

On August 3, 1936, or about that date, the Company learned that Statler was seriously ill. It then ceased its efforts to get further medical report, and sent its check to Mrs. Riney for the premium paid by Statler to MacGregor, and instructed Mrs. Riney to deliver it to Statler. We gather that Mrs. Riney did not deliver the check. She must have turned it over to MacGregor. Macgregor took the check and delivered it to Statler about August 7, 1936. Statler accepted the check, and

endorsed and cashed the same. The check had written on the reverse side thereof the following notation:

"Refund of amount tendered agent on policies 185157-8, which policies had been returned to Home Office and canceled as not taken."

We will later further discuss what occurred between Statler and MacGregor when the above check was delivered and accepted by Statler. Statler was already ill at the time he accepted the check. He died on October 21, 1936.

■ Before proceeding further we deem it expedient to announce several well-settled rules of law, which we think must govern the decision of this case:

1. Under the express provisions of Article 5063, R. C. S. 1925, any person who solicits applications for life insurance is to be regarded as the agent of the life insurance company, and not as the agent of the applicant; but such soliciting agent has no power to waive, change, or alter any of the terms or conditions of the application or the policy.

■ 2. Under the provisions of Article 4732, R. C. S. 1925, no policy of life insurance can be issued or delivered in this State by a life insurance company such as this, unless the same contains a provision "That the policy, or policy and application, shall constitute the entire contract between the parties, * * *."

3. The very wording of the above statutes and of many of our other insurance statutes shows plainly that our laws contemplate that all insurance policies issued by companies of this class must be in writing.

4. It is the settled law of this State that under the above statutes a mere soliciting agent of a life insurance company has no power or authority to make any contract on behalf of his company, or to waive the terms of the policy or the application therefore. Indianapolis Life Ins. Co. v. Powell, 133 Texas 547, 127 S. W. (2d) 172; Southland Life Ins. Co. v. Lawson, 137 Texas 399, 153 S. W. (2d) 953; Great Nat'l Life Ins. Co. v. Hulm, 134 Texas 539, 136 S. W. (2d) 602; Beaty v. Southland Life Ins. Co. (Civ. App.), 28 S. W. (2d) 895; Guarantee Fund Life Ins. Ass'n v. Barclay (Civ. App.), 11 S. W. (2d) 231. From the very nature of its business, a life insurance company such as this ought to know what insurance risks it has assumed;

and any rule of law which would permit a mere soliciting agent of such company to put in force oral contracts of life insurance would result in intolerable conditions, and make it impossible for such companies to.conduct their affairs in accordance with the numerous regulatory statutes of this State.

■ It is our opinion that, when we consider the facts of this record in their most favorable light for these respondents, no policy of life insurance issued by this Company was ever in force or effect on the life of William B. Statler, deceased. As already shown, when MacGregor solicited and took Mr. Statler's application for life insurance, he acted as a soliciting agent of this Company. He had no more and no less authority than such an agent. Under the above statutes and decisions, he had no power or authority to make an oral contract of life insurance with Mr. Statler. Under such statutes and decisions, he had no power or authority to alter the terms of the application signed by Mr. Statler, or to alter or change the terms of the insurance policy issued thereunder. The application signed by Mr. Statler expressly provided "that the policy or policies issued in consequence hereof shall constitute the entire contract of insurance, and the Company shall not be bound in any way by any promise or statement made by or to any agent, or other person, unless such promise, statement or information be reduced to writing, and submitted to the Company and made a part of this contract; that there shall be no liability hereunder until a policy shall be issued and manually delivered to me and accepted by me while in good health, and the first premium thereon actually paid during my lifetime, * * *." The policy tendered to and refused by Mr. Statler fully complied with the above application. It contained a provision that "this policy shall not be effective unless manually delivered to the insured while in good health and in insurable condition * * *." It further contains the provision, "No agent is authorized to modify this policy or in the event of lapse to reinstate it or to extend the time for paying premium." It further provided that the Company shall.not be bound by any promise or representation heretofore or hereafter made by any person, except those specified in the contract. Mr. Statler declined both policies issued by this Company and tendered to him. He requested the issuance of a policy of a later date,, providing for payment of premiums quarterly instead of annually. The Company was advised of this desire, but it did not even issue such a policy. Instead, it wrote MacGregor under date May 14, 1936. This letter was

shown by MacGregor to Mr. Statler on the occasion when Mr. Statler paid to MacGregor the quarterly premium on a $15,-000.00 policy, which MacGregor orally stated to Mr. Statler would be in effect on that date. Such oral agreement was in violation of the statutes and decisions above cited, and therefore beyond the power of MacGregor to make on behalf of this Company.. Mr. Statler was charged with knowledge of the above statutes, as well as with knowledge of the contents of his own application. The letter written by the Company last above referred to did not even remotely authorize MacGregor to bind this Company to an oral life insurance contract, or to waive, alter, or change the terms, conditions, or provisions of Mr. Statler's written application. To the contrary, this letter carefully preserved every right the Company had under the statutes and under the application. A mere casual reading of this letter will disclose that it expressly restricts any liability of this Company to a policy issued and delivered by the 23rd. Finally, we find no evidence in this record which even remotely shows, or tends to show, that this Company ever waived any of its rights above detailed, or committed any act which would estop it from asserting same.

Finally, it is our opinion that ,even if it should be conceded that the facts of this record show a contract of insurance fully and finally consummated when Mr. Statler paid to Mac-Gregor the sum of $73.95, as payment for the first quarterly premium thereon, still, under the undisputed facts of this record, such contract was rescinded, and such insurance surrendered, when this Company, through MacGregor, returned the amount of such premium so paid to Mr. Statler, and he accepted such return, in the manner and under the circumstances already detailed. If we properly interpret their brief and argument, counsel for these respondents content that such transaction did not constitute a rescission or surrender of the contract made through MacGregor, because MacGregor induced Mr. Statler to accept return of the premium he had paid by making false and fraudulent representations to him. As we interpret the opinion of the Court of Civil Appeals, it sustains this contention. The evidence in this record bearing on the issue of fraud is contained in the testimony of Mrs. Statler, one of the plaintiffs in this suit. This opinion has already been extended to such a length that we refrain from a full quotation of her testimony on this issue. Mrs. Statler testified as to what occurred and as to what was said by and

between Mr. Statler, MacGregor, and herself, at the time Mac-Gregor delivered to Mr. Statler the check of this Company, for the return of the quarterly premium he had theretofore paid to MacGregor. In our opinion, when Mr. Statler's testimony is reduced to its substance, it amounts to nothing more than a statement that MacGregor informed Mr. Statler that the Company had refused to recognize his oral contract made at the time Mr. Statler delivered his check to MacGregor, and had sent its check, payable to Mr. Statler, as a return of the premium paid by Mr. Statler to MacGregor. Such a statement constituted no act of fraud.

The judgments of the Court of Civil Appeals and district court are both reversed, and judgment is here rendered for Southland Life Insurance Company.

Opinion delivered June 24, 1942.

Rehearing overruled July 22, 1942.