**NATIONAL LIFE & ACCIDENT INS. CO. v. HOLBROOK.** *

No. 8793.

Circuit Court of Appeals, Fifth Circuit.

Jan. 5, 1939.

*Rehearing denied Feb. 27, 1939.

J. H. Burr, of Houston, Tex., for appellant.

J. S. Bracewell, of Houston, Tex., for appellee.

Before HUTCHESON and HOLMES, Circuit Judges, and DEAVER, District Judge.

HOLMES, Circuit Judge.

This appeal is from a judgment for the beneficiary in a policy of insurance upon the life of W. L. Holbrook, husband of appellee. The contention of the Company is that the policy had not been delivered and accepted, as required by its terms, during the life of insured.

The application for the policy contained a provision to be filled out when accompanied by a deposit of premium. It recited the deposit, and that the applicant, who held the receipt of the agent for the same, assented to the terms of said receipt. No premium was paid when the application was made, and the blank space was filled in as follows: "C. O. D. to cover." Attached to the application was a form of receipt to be detached and used by the agent receiving a deposit for premium. Since no premium was paid, this receipt was not used, but remained attached to the application until after its delivery to appellant. The application contained a recitation that the proposed policy should not become effective until the policy had been issued, the first premium paid and accepted, and the policy delivered to and accepted by the insured in his lifetime and while in good health, except as provided in the receipt above mentioned.

After the application, with the receipt attached, had been turned in to the district office of appellant, but before it received consideration at its home office, the insured paid in full the first annual premium on the policy. This payment was accepted by appellant as a deposit, and treated in the same manner as if it had accompanied the application. The receipt provided as follows:

"No insurance is in force on such application unless and until a policy has been issued thereon and delivered in accordance with the terms of such application, except that when such deposit is equal to the full

DEAVER, District Judge, dissenting.

premium on the policy applied for and such application is approved at the Home Office of the Company for the Class, Plan and Amount of insurance and at the rate of Premiums as so applied for, then, without affecting the issue date and anniversaries as set forth in the policy, the amount of insurance applied for will be in force from the date of this receipt, but no obligation is assumed by the Company unless and until such application is so approved.

"If a policy is offered by the Company that is not in all respects the same as the policy applied for, such policy will not take effect unless and until it has been accepted by the applicant and the additional premium therefor, if any, has actually been paid to and accepted by the Company during the lifetime of the applicant."

Appellant declined to issue the policy applied for, but issued one at a higher rate, providing for the same benefits and protection, and transmitted the same to its district agent, who received it on Saturday morning. The policy issued provided for payment on a semi-annual basis, and appellant had on deposit more than enough to pay the first semi-annual premium. The agent notified the insured of the arrival of the policy, and these two met at the office of appellant on Sunday morning, at which time the agent attempted to obtain the policy for delivery, but was prevented from doing so because the safe in which the policy had been placed was locked and the persons able to open it were not available.

On the trial of the case, the agent testified that he had explained to insured that the premium would be at a higher rate, but that the benefits and protection were the same as applied for; that, while the insured did not expressly say that he would accept the policy, he did use language which led to the belief that he would; that he gave his assent to the change in premium and method of payment; and that, on learning that it would be impossible to get the policy at that time, said, "Well, we will just have to wait," and asked the agent to bring the policy out to him. This testimony is corroborated and not denied or questioned.

After the failure actually to deliver the policy on Sunday, the agent was out of the city, and nothing further was done until the following Thursday afternoon. At that time, he called at the residence of the insured with the policy in his possession. He was informed that insured was sick, so went away without seeing him. He called again on Saturday to deliver the policy, and found insured sick in bed, so did nothing, because the rules of the Company forbid delivery when the insured is in "unsound health." On this occasion, the insured asked about the policy, and was assured by the agent that everything was all right. The agent next saw insured at the hospital late in the following week. Learning that the illness was serious, he returned the policy to the district office, which, in turn, returned it to the home office of appellant. The latter cancelled the policy and mailed its check for the amount of the premium deposit to the insured. It arrived after his death and was returned by appellee.

■ On the trial, appellant relied upon its motion for an instructed verdict. The motion was overruled, and the cause was submitted to the jury. Appellant contends that the receipt attached to the application, and referred to therein, does not affect the policy and application, because not executed by the agent and because not attached to the policy, as required by the Texas statute. The view that execution and delivery of the receipt were necessary to make it a part of the record of the negotiations between the parties would render meaningless the exception contained in the provision of the application with reference to delivery of the policy. The reference there is clear and explicit that the exception made in the receipt is to apply. It is not made dependent upon the signing and delivery of the receipt. The application effectively incorporates the receipt by reference, and adopts the provisions thereof. Acceptance of the application by appellant included the acceptance of the exception recited therein and set out in the receipt.

The statute relied upon is Article 5050 of the Revised Civil Statutes of Texas, which provides: "Every policy of insurance issued or delivered within this State by any life insurance company doing business within this State, shall contain the entire contract between the parties, and the application therefor may be made a part thereof."

■ In applying this statute, a distinction must be drawn between the policy itself and the negotiations leading thereto. The statute distinguishes between the two, providing that the policy shall contain the entire contract and that the application may be incorporated therein. Thus it was contemplated that the prior negotiations might or might not be integrated into the final agreement. Legal prerequisites being satisfied, a contract may come into being on

the acceptance of an application. Such a contract would not be a policy under the above statute, but it would be a contract of insurance. In determining whether or not the applicant was entitled to insurance, the provisions of the application and its acceptance would control. In determining whether or not certain contingencies were insured against and the protection afforded therefor, the provisions of the policy would control. Here, we are not concerned with the provisions of the policy, the right to recover being conceded if the policy went into effect prior to the death of the insured. Under these circumstances, the statute has no application.

We think this is entirely in accord with the case of Jefferson Standard Life Ins. Co. v. Baker, Tex.Civ.App., 260 S.W. 223, relied upon by appellant. In that case, a premium receipt, not attached to the policy, was relied upon to fix the anniversary date of the insurance. By its very nature, insurance is a contract relating to time, and, if the period for which the protection is to exist is not determined in some way, none is afforded. Any provision limiting or fixing the period is a part of the contract of insurance, and, under the above statute, would not be valid unless made in the policy.

█ Thus we find the parties agreeing in the application and its acceptance that no insurance would be in force thereon without delivery as recited therein, except that, when such deposit is equal to the full first premium on the policy applied for, and such application is approved at the home office of the Company for the class, plan, and amount of insurance, and at the rate of premiums applied for, then, without affecting the issue date and anniversaries as set forth in the policy, the amount of insurance applied for will be in force from the date of the receipt. Had the policy been issued in the form applied for, the protection would have been afforded from the date of the application, the issue date and anniversaries set forth in the policy notwithstanding.

█ The only difficulty arising on the death of the insured was the condition imposed in the last paragraph of the receipt. As applicable to this case, the provision is as follows: "If a policy is offered by the Company that is not in all respects the same as the policy applied for, such policy will not take effect unless and until it has been accepted by the applicant."

It is noted that the provisions requiring delivery of the policy, as contained earlier in the receipt, in the application, and in the policy, are omitted. Thus, while delivery and acceptance were treated as related and connected transactions and occurrences in the other provisions, here acceptance alone is required. In such case, acceptance is construed to mean assent, acquiescence, or agreement to the terms and conditions of the policy, and specifically in the present case to the change made in the application.

█ The authorities are uniform on the proposition that whether or not a policy of insurance has been accepted is a question of fact. The district court so held in denying the motion for an instructed verdict. Upon all of the evidence, an issue of fact was presented as to the meaning to be attributed to the words and conduct of the insured when the agent made his attempt to deliver the policy. If Holbrook agreed to the write-up in premium, he accepted the policy. Since this was a question upon which reasonable men might differ, the court appropriately submitted the cause to the jury. Cf. Amarillo National Life Ins. Co. v. Brown, Tex.Civ.App., 166 S.W. 658, and cases cited.

This renders it unnecessary to consider the question of whether manual tradition was necessary for delivery, or if it could be accomplished by an intention, coupled with appropriate conduct, to have the agent retain possession of the policy for the insured until it came manually into his possession.

The judgment of the district court is affirmed.

DEAVER, District Judge (dissenting).

After careful consideration of this case, I am forced to a different conclusion from that reached in the majority opinion. I do not find in the record any evidence that the policy was ever accepted by the insured.

The witness, J. C. Ellison, was soliciting agent of the Insurance Company at the time of the transaction in question, but not at the time of trial. He testified that he and the insured had been friends for several years and it is perfectly apparent from his testimony that he was a very willing witness for appellee. Those facts do not, of course, constitute any reason to discredit any statement made by the wit-

ness but they do constitute a reason for not interpreting his testimony any more favorably to appellee than is warranted by the facts stated by him, as distinguished from his conclusions. In the majority opinion, I believe the import of his testimony is too strongly stated. I quote from the opinion: "On the trial of the case, the agent testified that he had explained to insured that the premium would be at a higher rate, but that the benefits and protection were the same as applied for; that, while the insured did not expressly say that he would accept the policy, he did use language which led to the belief that he would; that he gave his assent to the change in premium and method of payment; and that, on learning that it would be impossible to get the policy at that time, said, 'Well, we will just have to wait,' and asked the agent to bring the policy out to him. This testimony is corroborated and not denied or questioned."

Instead of testifying that insured used language which led to the belief that he would accept the policy, the agent testified that he thought the insured would accept the policy, without giving any language of insured that so indicated, and without stating any valid basis for such belief. I do not find any testimony of the agent that insured gave his assent to the change in the premium and method of payment. According to the record, the agent testified that he did not tell insured the premium was on a semi-annual basis.

The testimony of the witness bearing on the question of acceptance of the policy is set out below as it appears in the record:

"I next saw Holbrook (insured) Sunday morning. * * * There was a discussion between Holbrook and me about the policy. I told him the policy had come in and it had been rated up, that is, that he had been rated up physically. He asked me to bring the policy out to him. I did not tell him the amount it had been rated up. I didn't know the exact amount. I told him approximately. I don't remember what the amount was. I did tell him the approximate amount. It was within a few dollars, a dollar or two one way or the other. He told me to bring it out. * * *

"I saw Holbrook again that day. * * * There was further conversation about the policy. I went back to tell him that I couldn't get it; that it would be the following Monday morning before we could get the contract; that it would be Monday morning, the next day, before we could get it. * * *

"I told Mr. Holbrook that it would be impossible to get the contract before Monday morning, due to the fact that it was locked up in the safe. I don't know that he said anything about it other than, 'Well, we will just have to wait', or something to that effect. * * *

"The policy was never delivered to him. I mean the actual possession never passed to Mr. Holbrook. * * *

"Cross Examination

"* * * I had my conversation that Sunday morning with Mr. Holbrook that I have testified about. I did not know the exact figure that he had been rated up. I told him approximately the amount. I do not recall now how much I did tell him it was; around $50.00 or $60.00 maybe. I don't remember the figures now. I did not tell him it was written on a semi-annual instead of an annual basis.

"Mr. Holbrook asked me if I could get it and bring it out. That is what he said. Then I made the effort * * * to get the policy. * * * I told him (Holbrook) that as soon as I got back from my trip I would see him. * * *

"Thursday, the first day I was back in Houston, I got the policy and went out to his house in the afternoon to see him. I went out there to deliver the policy to him. I wanted to deliver it. * * *

"When I got out to the house I found Mr. Holbrook was ill in bed. He asked me about the policy. I told him that I had the policy. I told him also that the thing for him to do, not to worry about it, but for him to get well; that that was the important thing. I never tried to deliver it to him. I told him to get well; that the contract was written; that I had it.

"Q. Yes, but Mr. Holbrook never did tell you that he would accept the policy, did he? A. In plain words, no.

"Q. You didn't know whether he would take it or whether he wouldn't, did you? A. I was quite positive he would take it.

"Q. Well, but he hadn't indicated that he was positive he would take it? A. No, not positively. * * *

"Q. But you do say that Mr. Holbrook had never definitely told you that he would

take the policy. The most he had told you was to bring it out. That is right, isn't it? A. Yes, sir. * * *

"I was merely keeping this policy for my convenience, so I would have it when I went out to see Mr. Holbrook to deliver it to him. * * *

"When I was talking to Mr. Holbrook I did not know what classification he had been given, other than the rate up in premium only. After I talked to Mr. Holbrook on that day, that Sunday morning, I never discussed with him the question of whether the semi-annual premium was acceptable. * * * Whether he still insisted on an annual premium, or semi-annual, I did not talk with him. * * *

"When I went out there on that Thursday the second time, if he was well of course I was going to deliver the policy. I think I could have.

"Q.. But I believe you testified you didn't know for sure; he had never definitely accepted the contract? A. He didn't definitely, no.

"All the conversation I had with Mr. Holbrook is what I have testified to here.

"When I went out there on the first Thursday morning Mr. Holbrook asked me if I had the policy, and I told him Yes. I told him not to worry about it, that everything was all right, for him to hurry and get well.' * * *

"Recross Examination

" * * * I did say here a minute ago that Mr. Holbrook had never accepted definitely this policy and the rating up, I meant what I said. I would not say that I knew that the policy had to be sold again. * * *

"I testified I went back to see Mr. Holbrook that Sunday afternoon when I couldn't get the policy. * * * I told Mr. Holbrook that I was going out of town and that I would bring it out to him as soon as I got back. * * *

"Re-Direct Examination

"When I said Mr. Holbrook did not accept this policy I meant that I never handed him the contract. My testimony is true about what Mr. Holbrook said when I told him it was uprated. He said to me: 'Bring the contract on out.'

"Re-Cross Examination

"He asked me if I would get it and bring it out to him.

"Q. And you didn't know whether he would accept it then and pay for it or not, did you? A. I wouldn't say I was positive, but then a man's word was—

"Q. You felt reasonably sure you could sell him, is that right? A. Oh, I was reasonably sure he would accept, yes. * * *"

The witness does say in one place "I was quite positive he would take it", but he gives no reason for thinking so. His very next statement is that insured had not indicated that he was positive he would take it and had never definitely said he would take it; that the most he had said was to bring it out.

In another place, witness says "I think I could have" delivered the policy on Thursday if insured had been well. Again he states no fact as a basis for his so thinking. On the contrary, he follows that statement by saying, "he didn't definitely" accept the contract, which statement he later explains by saying he meant he did not hand the contract to insured. The witness then stated "I wouldn't say I was positive" that he would accept it, and finally adds "Oh, I was reasonably sure he would accept" the policy. But regardless of the witness' conjecture as to what insured might have done, the question is, did he accept it? The agent said he thought insured would accept it but he does not say that he even thought insured did accept it.

To my mind, the effect of the witness' testimony is that insured never did accept the policy, but for some unstated reason witness thought insured would have accepted it, if witness had tendered it to him.

Anything that may have been said while insured was seriously ill has no particular bearing on the question. If the policy had not already been accepted, the agent could not have delivered it at that time. If the insured had not already accepted the policy, then his inquiry about the policy while he was ill and shortly before he died, and the agent's statement that everything was all right, could not constitute an acceptance.

The money paid by insured was kept in the company's suspense account awaiting insured's acceptance of the policy. Insured never did authorize the Company to apply that money to the payment of the premium on the policy written, and the Company did not so apply it and had no right to do so until after acceptance.

If there ever was any contract between the Company and the insured, it was binding on both parties. If the policy was accepted, then the insured became bound to pay the premium or permit the Company to apply the money in the suspense account to its payment. Now, suppose insured had not died and had sued the Company for return of the money deposited, on the ground that the policy written was different from the one applied for and had never been accepted. Does any one suppose that the Company, on the same facts here relied upon to show acceptance, could have successfully defended the suit? Or suppose there had been no deposit and the premium had been payable upon acceptance of the policy and the insured had remained in good health and the Company had sued him for the premium, could any one imagine success in such a suit, if the Company presented the same facts to show acceptance of the policy as those appearing in this record? The fact of acceptance does not depend upon which party wishes to urge it. If there was acceptance, it bound both parties.

There is, I think, no substantial evidence that the policy ever was accepted and the court in my opinion should have directed a verdict for the appellant.