**UNITED FOUNDERS LIFE INSURANCE CO., Appellant,**

v.

**Glynda Bruce CAREY et vir, Appellees.**

No. 10832.

Court of Civil Appeals of Texas.

Austin.

April 5, 1961.

Rehearing Denied May 17, 1961.

Second Motion for Rehearing Denied June 7, 1961.

Upton, Upton, Baker & Griffis, W. A. Griffis, Jr., Craig Porter, San Angelo, for appellant.

Snodgrass, Smith & Rose, Frank W. Rose, Jr., San Angelo, for appellee.

HUGHES, Justice.

This suit is upon and in connection with an alleged contract of life insurance between appellant, United Founders Life Insurance Company, and the insured, Billy Gene Bruce, for the benefit of appellee, Glynda Bruce Carey, the surviving but remarried wife of insured.

Trial to a jury resulted in a judgment for appellee for the principal sum of $25,000, the amount of the alleged insurance.

On July 27, 1958, the insured who was then an insurance salesman for the appellant Insurance Company applied to it, in writing, for life insurance on himself for $25,000, naming his wife, appellee, as his beneficiary. This application contained the following provisions:

"It is agreed that: (1) The Company shall incur no liability under this application until it has been received and approved, a policy has been issued and delivered, and the full first premium specified in the policy has been actually paid to and accepted by the Company while health, habits and occupation of the proposed insured remain as described in this application in which case the policy shall be deemed to have taken effect as of the date on which the policy was signed. However, if the full first premium specified in the application on the policy applied for is paid on the date of this application and the receipt bearing the same serial number as this application is issued to the applicant, then the liability of the Company shall be as stated in the receipt."

The premium mentioned was paid by the insured and appellant issued a receipt therefor containing these provisions:

"Received * * * the sum of * * * for the full first premium specified in the application for insurance in the United Founders Life Insurance Company which bears the same date and serial number as this receipt. The insurance under the policy for which application is made shall be effective on date of this receipt or the date of completion of the medical examination (if required) whichever is the later date, if in the opinion of the authoriz-

ed Officers of the Company at its Home Office in Oklahoma City, Oklahoma, the Proposed Insured is insurable and acceptable for insurance under its rules and practices on the plan of insurance, for the amount of insurance and at the premium rate set in the application, exclusive of any amendments in the space for 'Home Office Additions or Correction.' However if the Proposed Insured dies prior to the Company's actual issuance and delivery of the policy applied for, the total liability of the Company under this receipt and other insurance in force in this Company shall not exceed $50,000. If the Company declines to issue a policy or issues a policy other than the policy for which application is made, the Company shall incur no liability hereunder, except to return by its check the above payment upon surrender of this receipt. This receipt shall be void if given for check or draft which is not honored on presentation."

Based on the application for insurance made by insured, the receipt issued him by appellant and the evidence, the Court submitted the following issue to the jury, which answered it as indicated:

"Do you find from a preponderance of the evidence that prior to Billy Gene Bruce's death in the opinion of the proper official of United Founders Life Insurance Company Billy Gene Bruce was insurable and acceptable for insurance under its rules and practices on the plan of insurance, for the amount of insurance, and at the premium rate set in his application for life insurance?

"Answer yes or no.

"Answer: Yes."

Appellant's first four points are to the effect that there was either no evidence or there was insufficient evidence to sustain the answer given by the jury to this issue.

We will dispose of these points by making one statement, and since we are of the opinion that the points relating to the insufficiency of the evidence are not well taken, we will state the substance of and consider all the evidence bearing on these points and the issue to which they relate. This ruling will effectively dispose of the no evidence points without special or separate treatment.

In May or June of 1958, Mr. Bruce, the insured, began employment as an agent of appellant Insurance Company for the purpose of selling life insurance. His immediate supervisor, the general agent in San Angelo for appellant company, was Mr. Gerald Stewart. As such agent and salesman, Mr. Bruce attended a company school in Oklahoma City shortly after the beginning of his employment to familiarize himself with life insurance and the sale of life insurance, and with the rules and practices of his own company. One of these practices with which Mr. Bruce became familiar at this school and through his own selling efforts was that of the necessity and requirement by appellant for "reinsurance" in every case where application was made to appellant for insurance in excess of $5,000. By such procedure, when an application for insurance in excess of $5,000 was received by appellant, it secured through its agent on the application a medical examiner's report and a credit or inspection report and submitted these items, together with the application and an application for reinsurance, to its reinsurer, Republic National Life Insurance Company, for the latter's underwriting action, its consideration and for either approval or rejection of the application for reinsurance.

In making submissions to its reinsurer, Republic, appellant used a certain printed form made up of three sheets of white papers, alternatively separated by sheets of carbon paper, all joined together at the top by a perforated band or tab. The make-up of this form was such that if the form was inserted into a typewriter and words

or letters typed upon the first page, the action of the carbon paper between the sheets of the form was such as to print the same words or letters upon the second and third pages of the form. The make-up of the form was such as to have printing upon each of the sheets, but with the printed words differing in some instances from the first sheet to the second or third sheets. Thus, the result of a word or letter being typed adjacent to the printed language of the first page of the form, through the action of the carbon paper, made the same word or letter appear adjacent to other and different printed language on the second and third pages of the form.

The actual procedure between appellant and Republic was for the appellant's underwriting department to submit the first page of the form, headed "Application for Reinsurance to: Republic National Life Insurance Company, Dallas, Texas" to Republic, along with the insurance application, the applicant's credit report and his statement from the medical examiner. In this manner, in reinsurance cases, appellant used the medical and underwriting departments of Republic to pass upon the insurability of the applicant under consideration, since Republic would assume the insurance risk for the amount above the initial $5,000 in the event of the approval of the application by appellant and Republic and the issuance of the policy.

Appellant submitted the application, the credit report and the medical examiner's report of Bruce to Republic on September 5, 1958. At such time it also partially completed the three-sheet, carbon-paper form and submitted the first page of the form to Republic, retaining pages 2 and 3 in its file. The second and third pages were headed "Formal Cession of Reinsurance to Republic National Life Insurance." The second and third pages were never submitted to Republic, nor did they ever leave the files of appellant's underwriting department. Bruce's application and medical report were never submitted to appellant's own medical director, since the application was considered as a reinsurance matter, being for insurance in excess of $5,000.

On September 8, 1958, Republic wired appellant's underwriting department that the application of Mr. Bruce was approved as a standard risk subject to "statement any doctor consulted within past five years regarding nervous disorder."

An inter-office memorandum of September 9, 1958, shows that Helen Smith, Chief Underwriter of appellant, advised appellant's General Agent, Gerald Stewart, that, regarding the insured, "It will be necessary that we have a statement from any doctor you have consulted during the past five years regarding nervous disorder before we can complete the processing of your application for life insurance."

A report, in response to this memorandum, was made by Dr. Valton Sessums September 29, 1958, and was received by appellant October 1, 1958.

On October 4, 1958, the insured wired appellant inquiring about the delay in the issuance of the insurance policy for which he had applied.

On October 6, 1958, appellant's Chief Underwriter advised its General Agent that the report from Dr. Sessums had been received and forwarded to its reinsurance company on October 1, and that she had on October 6, received a wire from the reinsurer requesting a review of electrocardiograms made by Dr. Sessums, and that a loan of them by Dr. Sessums had been requested.

On October 2, 1958, the insured left the employ of appellant.

On October 16, 1958, appellant's underwriter, by an inter-office memorandum to the insured, requested a follow-up on the last request made to Dr. Sessums.

On October 18, 1958, the insured was critically injured in an automobile accident, dying from such injuries on October 23, 1958.

On this date, appellant, not knowing of the accident to Mr. Bruce, having learned that Dr. Sessums had not made the heart examination was attempting to find the doctor who had made them.

Mrs. Helen Smith, Chief Underwriter for appellant, testified by deposition as well as in person on the trial. By her pretrial deposition she made this statement:

"Q. Let me ask you at this point, Mrs. Smith: In this $25,000.00 application of Billy Gene Bruce's or any other $25,000.00 application under your company regulations, could you approve that application without the approval of the reinsurance carrier?

"A. I could."

We insert copies of (1) Preliminary Application for Reinsurance, sent to Republic and (2) Formal Cession of Reinsurance to Republic, which was retained by appellant and not sent to Republic:

---

**Preliminary Application For Reinsurance To: Republic National Life Insurance Company, Dallas, Texas**

☐ FACULTATIVE — We request your underwriting action. Reply requested.

☐ AUTOMATIC BINDING NOTICE — Republic National will advise only if adverse information is found.

| Name of Proposed Insured | Issue Age | Date of Birth | State of Birth | State of Residence |
|---|---|---|---|---|
| Bruce, Billy Gene | 30 | 1-26-28 | Texas | Texas |

| Occupation of Insured | Name of Payor or Beneficiary (If payor benefits or Beneficiary Indemnity is applied for.) | Date of Birth of Payor or Beneficiary |
|---|---|---|
| Insurance Agent | | |

Aviation Clause? No

War and Aviation Clause? No

**DO NOT TYPE IN THIS SPACE!**
(Outlined By Double Lines)

| | LIFE (Include F.I. Commuted Value) | DISABILITY | PAYOR | DOUBLE INDEMNITY | PLAN |
|---|---|---|---|---|---|
| Prior Insurance in force | $ | $ | $ | $ | |
| Of which we retain | $ | $ | $ | $ | |
| Rating, if substandard | | | | | |
| New Insurance applied for | $ 25,000 | $ | $ | $ | Ex. Prot. |
| Of which we will retain | $ 5,000 | $ | $ | $ | |
| Rating, if substandard | | | | | |
| Reinsurance applied for | $ 20,000 | $ | $ | $ | |

**DO NOT TYPE IN THIS SPACE!**
(Outlined By Double Lines)

DEFENDANT'S EXHIBIT NO. 24

| Name of Original Company | Number | Dated at (City and State) | Date of Preliminary |
|---|---|---|---|
| United Founders Life Ins. Co. | 1213 | Oklahoma City, Okla. | 9-5-58 |

Has this case been submitted elsewhere for reinsurance?_____If YES: specify companies below:

If a member of MIB, the original company will please indicate below the codes which will be reported to the bureau.

Will any additional papers or special studies be forwarded later?_____If YES: list below:

Remarks:

R-990-857 Forward this copy only. (Attach copies of your papers if facultative.)

Formal Cession of Reinsurance To: **Republic National Life Insurance Company,** Dallas, Texas

~~16 22 16~~

| [x] FACULTATIVE | We request your underwriting action. Reply requested. | [ ] AUTOMATIC BINDING NOTICE | Republic National will advise only if adverse information is found. |
|---|---|---|---|

| Name of Proposed Insured | Issue Age | Date of Birth | State of Birth | State of Residence |
|---|---|---|---|---|
| Bruce, Billy Gene | 30 | 1-26-28 | Texas | Texas |

| Occupation of Insured | Name of Payor or Beneficiary (If payor benefits or Beneficiary Indemnity is applied for.) | Date of Birth of Payor or Beneficiary |
|---|---|---|
| Insurance Agent | | |

| Date of Original Policy | No. of Original Policy | W.P. or P.P. Form No. | Accidental Indemnity Form No. | Aviation Clause? |
|---|---|---|---|---|
| | | | | No |

| Policy Form No. | Short Term From | Reserve Basis (Show mortality table, interest rate, and method of Valuation.) | Date of Formal | War and Aviation Clause? |
|---|---|---|---|---|
| | | | | No |

| | LIFE (Include F.I. Commuted Value) | DISABILITY | PAYOR | DOUBLE INDEMNITY | PLAN |
|---|---|---|---|---|---|
| Prior Insurance in force | $ | $ | $ | $ | |
| Of which we carry | $ | $ | $ | $ | |
| Rating, if substandard | | | | | |
| We are issuing new Insurance For | $ 25,000 | $ | $ | $ | Ex. Prot. |
| Of which we will carry | $ 5,000 | $ | $ | $ | |
| Rating, if substandard | | | | | |
| Reinsurance requested for | $ 20,000 | $ | $ | $ | |

If return of Premium Benefit is included, show amount of premium returned per $1000 — $_____

Show Annual Premium Liability per $1000 of Insurance and/or F.I. Unit for W.P. or P.P. $_____

Show W.P. or P.P. Annual Premium per $1000 of Insurance and/or F.I. Unit. $_____ Cease Date_____

If monthly income disability, show amount of Income Reinsured. $_____ Cease Date_____

Double Indemnity and/or Beneficiary Indemnity. (Cease Date Only) Cease Date_____

**Complete For Standard Automatic Cases Where Papers Are Not To Be Forwarded.**

Occupation_____ Race_____ Sex_____

Height_____Weight_____Blood Pressure (Not required in non medical cases)_____

Impairments_____

| Name of Original Company | Number | Dated at (City and State) | Date of Preliminary | By: |
|---|---|---|---|---|
| United Founders Life Ins. Co. | 1213 | Oklahoma City, Okla. | 9-5-58 | |

The above application is accepted and the reinsurance granted, subject to all the terms and conditions of the contract of indemnity reinsurance now in force between the aforesaid Original Company and

Dated at Dallas, Texas _____ **THE REPUBLIC NATIONAL LIFE INSURANCE COMPANY**

*Frank A. Brunswick*

Republic National Life Cession Number _____ REINSURANCE SECRETARY

Dept's 44 8
(Depo, Smith,
6-17-59)

R-101 157 Forward Both Copies of Formal Cession Upon Issuance of Your Policy

DEFENDANT'S EXHIBIT NO.

---

Mrs. Helen Smith regarding her duties and authority as Chief Underwriter for appellant, testified:

"Q. Now, Mrs. Smith, describe generally if you will the duties of your position as chief underwriter for United Founders. A. My duties are to assemble and compile the facts, papers and histories that are necessary to either approve or postpone or decline the applications for life insurance.

"Q. Are you the official in the company vested with the authority and discretion for either accepting or rejecting applications for insurance? A. Yes, sir, I am.

"Q. And are you the only official in the company who has that responsibility placed upon you? A. Yes, sir.

"Q. And did you have that responsibility placed upon you in connection with the application of one Billy Gene Bruce? A. Yes, sir."

Mrs. Smith testified that she received Mr. Bruce's application for insurance on August 18, 1958, and that on the next day she received a credit report concerning him. On September 5th she received a medical report on Mr. Bruce. Mrs. Smith apparently read the medical report because she testified that when she received this report she noticed that Mr. Bruce was overweight.

In the testimony given by Mrs. Smith in person on the trial she explained in detail, and somewhat in contradiction of her deposition testimony, her duties, authority, and manner of processing applications for insurance in excess of $5,000. We quote from her trial testimony:

"Q. All right, Mrs. Smith, let me ask you something about a formal cession of life insurance to Republic National Life Insurance Company for reinsurance; at the time this application was going on and at the present time did your company have an agreement and arrangement with Republic National Life Insurance Company under the terms of which it re-insured risks acceptable to it, and to you, over $5,000? A. Yes, sir.

"Q. You would retain $5,000 and cede to them, for their approval, anything in excess of that, is that right? A. That's right.

"Q. The form that you used made up in connection with these applications to Republic National Life Insurance Company, both in the Billy Gene Bruce and in all others, was that made up as soon as your application came in, or as reasonably soon thereafter as it could be made up? A. As soon as the application came in and we had the medical information that would start the processing of it, and the inspection report.

"Q. Was that something typed up without regard as to whether you had ever arrived at an opinion as to the insurability and acceptability of risk? A. Yes, sir.

"Q. That was before you had crossed that bridge, is that right? A. Yes, sir."

Referring to the above formal cession of reinsurance, she testified:

"Q. Now, I notice up in the left-hand corner there's a box for a mark to be inserted, and then over in the righthand side at the top of the page there is also a box where a notation could be inserted; that one to the left says 'Facultative: We request your underwriting action, reply requested;' over to the right is one, 'Automatic binding notice; Republic National will advise only if adverse information is found.' And I notice there is an X in the box for *Faculative,* and none in the one for Automatic; will you explain that to us, please? A. That merely means, Mr. Griffis, just exactly what it says here. When we send our application with the information that we have attached thereto we request Republic National to advise us of their underwriting action on these papers.

"Q. This Defendant's Exhibit No. 22 which is—you can see on the face of it it is a carbon copy; that is not the part that went to Republic National, is it? A. No sir, this is the part retained in our files."

Mrs. Smith also testified:

"Q. Now, at the time you sent this application for re-insurance in to Republic National, Mrs. Smith, had you

reached any opinion or conclusion as to whether or not Mr. Bruce's application was acceptable? A. No, sir.

"Q. What were you actually sending it to Republic for? A. To get their opinion.

"Q. Now, is that or not part of the service that Republic renders you as your re-insurance carrier? A. Yes, sir.

"Q. To investigate and make determinations as to insurability on your applications? A. That is correct.

"Q. Does that or not avoid a duplication and expense and effort? A. It does.

\* \* \* \* \* \*

"Q. All right, Mrs. Smith, what would happen had you received an O.K. from Republic National? A. If it had been approved by Republic National then we would have received a wire that the application had been approved. After we received that wire of approval we would then have mailed the additional two copies.

"Q. To Republic National? A. Of formal cession to Republic National.

"Q. And for the first time you would have said, we are issuing so much insurance? A. That's right.

"Q. So, what you have done in filling out this form, you had made up in advance for possible future use the complete forms of the last two pages of this three page form, is that right? A. That is correct.

"Q. Would that in any manner evidence any intent or opinion on your part that you had approved Mr. Bruce for his application for insurance? A. Repeat that?

"Q. I said, the mere fact you made up that form, would that in any man-

ner or to any extent indicate you had reached an opinion as to Mr. Bruce's insurability or non-insurability? A. No, sir.

\* \* \* \* \* \*

"Q. Is the only reason you are denying this claim is because you never did accept it? A. This application on Billy Gene Bruce had never been completed. It had never been accepted or rejected. It was still in a pending status. We were still trying to secure the information."

Testimony was also introduced to the effect that Republic had never acted on appellant's application for re-insurance.

█ Appellant used very plain language in providing in the application made to it for insurance that it would incur no liability under the application until it had been received and approved and a policy issued and delivered and other limiting provisions. A policy could not be delivered before it is issued, and delivery is usually a matter of which the insured is aware and about which proof can be easily made. There certainly would be no liability here if appellant had been content to rest upon these clear and understandable provisions in its application form. It is well known that the life insurance business is in a very competitive field and perhaps for this reason, but certainly as an inducement to obtain the prepayment of the first premium, appellant assumed "the liability" stated in the premium receipt.

When we turn to this receipt, we find that the plain, clear and readily understandable provisions of the application restricting liability have vanished and in their stead is the vague, intangible and, we believe, deceptive language that the policy for which application is made shall be effective at the times stated if the proposed insured is "insurable and acceptable for insurance under its rules and practices on the plan of insurance," for which application is made.

How easy it would have been for appellant to have provided specific and ascertainable circumstances under which its liability would attach under the receipt, as it did when the first premium is not paid. By "ascertainable circumstances," we mean fairly ascertainable to both parties. Here the evidence of existence of insurance, vel non, is buried in the private files of the insurer, or even more inaccessible, it is hidden in the mind of its Chief Underwriter. For all practicable purposes, the insurer has until the policy is issued and delivered to decide whether an applicant has been insured or not.

We used the word "deceptive" in describing the terms of this receipt. They provide that the insurance shall become effective at the times stated when in the opinion of its proper officers the insured is "insurable and acceptable for insurance under *its* rules and practices." Appellant interprets this to include, and for that matter to encompass the delegation of sole authority for approval to its re-insurer, the rules and practices of its re-insurer with which the applicant for insurance has not agreed to contract and may not wish to contract. This is, we believe, misleading.

We further observe that unless the date of the receipt or the date of completion of medical examination coincides with the date on which insurer formulates its opinion of insurability, a very unlikely occurrence, there would be a period of time during which the insured is charged for insurance when he is not in fact insured.

Between the time when an insurer decides to accept an application for insurance and the time when this opinion is published in some manner available to applicant (no time is fixed in the receipt, nor does it provide for notice) there is a period when the applicant is insured but he is not aware of it and is in a very poor position to prove it. We realistically discount the instances in which the proper official of a company had formulated but who had not published an opinion of insurability would divulge such opinion after a loss had occurred.

It seems to us that the terms of this receipt are contrary to public interest and sound insurance practices.[1] In Southland Life Ins. Co. v. Statler, 139 Tex. 496, 163 S.W.2d 623, 630, it is stated " * * * From the very nature of its business, a life insurance company such as this ought to know what insurance risks it has assumed. * * *"

By the same token, an applicant for insurance should know when he is insured, and he should not pay for insurance he does not have.

The difficulty in pleading matters peculiarly within the knowledge of the adverse party is recognized, and here the pleader is only required to do the possible. McDonald, Texas Civil Practice, Sec. 507. Leniency in pleading under these circumstances is logically followed by a similar leniency in proof. We are satisfied that the proof under these circumstances, while it must measure up to legal standards, is weighed by the jury with these circumstances heavy in their minds.

Mrs. Smith, in addition to her testimony previously stated, testified that she had sent in applications for insurance to the re-insurer which, in her opinion, were not approvable, but she could not recall such an application. She further testified that if the re-insurer disapproves an application, then she disapproves it, and if the re-insurer approves she has never disapproved.

It seems to us most unlikely, unreasonable and very unbusinesslike for an insurance company to approve an application for insurance in any amount (here appel-

---

1. See Colorado Life Co. v. Teague, Tex.Civ.App., Eastland, 117 S.W.2d 849, writ dism.

lant re-insured only the excess of $5,000.00) when it did not believe the applicant was insurable or the risk was not acceptable.

■ In any event, we believe the jury had the right, under all the evidence, to find as it did, and we are not of the opinion that such finding is so clearly wrong or so against the great weight and preponderance of the evidence as to be manifestly unjust.

Appellant's fifth point is that the court erred in rendering judgment for appellee for the reason that the policy of insurance applied for by Mr. Bruce was not offered in evidence.

■ There is a distinction between a contract of insurance and an insurance policy. This is pointed out in National Life & Accident Ins. Co. v. Holbrook, 5 Cir., 100 F.2d 780, 782, where the court stated:

"In applying this statute [21.24] Ins. Code], a distinction must be drawn between the policy itself and the negotiations leading thereto. The statute distinguishes between the two, providing that the policy shall contain the entire contract and that the application may be incorporated therein. Thus it was contemplated that the prior negotiations might or might not be integrated into the final agreement. Legal prerequisites being satisfied, a contract may come into being on the acceptance of an application. Such a contract would not be a policy under the above statute, but it would be a contract of insurance. In determining whether or not the applicant was entitled to insurance, the provisions of the application and its acceptance would control. In determining whether or not certain contingencies were insured against and the protection afforded therefor, the provisions of the policy would control."

■ In Dalton v. Norwich Union Fire Ins. Soc., Tex.Com.App., 213 S.W. 230, 231,

it is held that a contract of insurance "is to be construed in accordance with the terms and subject to the conditions of the standard form of policy in use by the insurer at the time."

■ Our statutes provide that a policy of life insurance must contain and must not contain certain provisions. Arts. 3.44, 3.45, Ins.Code, V.A.T.S. The parties to an insurance contract are charged with knowledge of these statutes. Southland Life Ins. Co. v. Statler, 139 Tex. 496, 163 S.W. 2d 623.

■ It is our opinion that under the pleadings in this case that the application for insurance, the receipt and the applicable statutes referred to above constitute sufficient evidence of the contract of insurance effected by the parties. Pacific Mutual Ins. Co. v. Talbert, Tex.Civ.App., Beaumont, 271 S.W.2d 487, no writ history.

By its sixth point appellant contends that since Mr. Bruce, the insured, was its employee a fiduciary relationship was created which imposed a legal presumption of fraud upon the transaction constituting the basis of this suit, arising from misrepresentations made by Mr. Bruce, which appellee failed to overcome by evidence and fact findings.

We copy and adopt appellant's statement under this point:

"Billy Gene Bruce was Appellant's agent, its representative in making sales of insurance, from May or June of 1958 to about a week before October 2, 1958. As such agent, he solicited his own application for insurance, signing the application both as Proposed Insured and as Agent. As Agent, Mr. Bruce completed a report upon himself on the reverse side of Defendant's Exhibit No. 1, saying that he had known himself, the Proposed Insured, for life; that his own appearance indicated to him health and a strong constitution; that there was no obvious deformity,

or impairment of sight, speech or hearing of himself as the Proposed Insured; that he personally saw himself complete and sign the application, and that 'as Agent for this company' he unreservedly recommended himself for standard insurance.

"In its Answer and Cross-Action, Appellant pled that Bruce had given false answers to questions asked by the medical examiner of him, these answers were knowingly and intentionally made to induce Appellant to issue a policy of insurance upon the life of Appellee's husband, and that Appellant relied upon such answers as being true. Further, Appellant pled that Bruce was under 'a duty to exercise the utmost good faith and honesty toward Defendant by virtue of his employment as its Agent' and 'that as such Agent he owed to Cross-Plaintiff, because of his position of trust, the duty of complete disclosure and unqualified truthfulness in his dealing with Cross-Plaintiff'. Both in its answer to Appellee's position and by its cross-action, Appellant charged Billy Gene Bruce, its Agent, with fraudulent conduct surrounding his application for such insurance, due to the alleged false representations made by Bruce in such application and the statement to the medical examiner.

\* \* \* \* \* \*

"These charges of fraud leveled by Appellant in its pleadings were thereafter borne out by jury findings that Billy Gene Bruce had falsely represented to Appellant that he had never had any disease or disorder of the stomach, and he knew or should have known that this representation was in fact untrue. The jury found that Appellant relied upon this false representation in reaching the opinion that Billy Gene Bruce was insurable and acceptable for insurance. The jury found that Bruce falsely represented the date of his last attendance by a physician, which he knew or should have known was in fact untrue, and that the Appellant relied upon this false representation in reaching the opinion that Bruce was insurable and acceptable for insurance. The jury found that Bruce falsely represented that he had consulted no physicians within the five years previous to his application except a Dr. Butner, which he knew, or should have known was in fact untrue, and the Appellant relied upon this false representation in reaching the opinion that Bruce was insurable and acceptable for insurance."

Without objection the jury was charged as follows:

"By the term 'willfully' as used in this Charge is meant that the statements were knowingly and intentionally made, rather than statements made through ignorance or inadvertence.

\* \* \* \* \* \*

"In connection with the issues contained in this Charge inquiring as to false representation, if any, and the willfullness thereof, if any, by and on the part of Billy Gene Bruce, you are instructed that the said Billy Gene Bruce, as an agent of defendant, United Founders Life Insurance Company, occupied a fiduciary relationship and owed to said company the duty of good faith and full disclosure."

In addition to the jury findings referred to by appellant in its statement, supra, the jury found that none of the false representations made by Mr. Bruce was "willfully" made with the intent to induce appellant to approve his application for insurance.

In the absence of affirmative findings to these issues, appellant was not entitled to a judgment on the verdict on the issues of fraud. Clark v. National Life & Accident Ins. Co., 145 Tex. 575, 200 S.W. 2d 820.

Appellant's position, as we understand it, is that once the fiduciary relationship is shown "and the burden of merely raising the question of fraud on the part of the agent in his dealings with the principal in that transaction" is discharged, then a presumption of fraud arises which "Appellee failed to overcome by any request for special issues to support findings which would negative or overcome the presumption."

Appellant cites Restatement of Law of Agency, 2d Ed., Sec. 390, to the effect that an agent has the duty of acting fairly and making full disclosure when dealing with his principal and that "The burden of proof is on the Agent to show that he has satisfied all the duties required by the rules stated in this Section."

Appellant also cites Fraud and Deceit, Vol. 20–A, Tex.Jur. p. 12, and the opinions of this Court in Bell v. Ramirez, 299 S.W. 655, writ ref.; Scott v. Weaver, 2 S.W, 2d 870, writ dism., and other authorities to the effect that when a fiduciray relationship is shown and the involved transaction is attacked for fraud and the party accused has obtained an advantage, a presumption of unfairness arises which such party must dispel by showing the transactions to having been fairly made.

. Appellant pleaded fraud as a defense, the nature of which is reflected by the issues to which we have adverted.

■ There is no question here of the charge to the jury not adequately presenting these issues of fraud, and there is no contention that the jury findings that Bruce's misrepresentations were not willfully made were not supported by sufficient evidence. The only question presented by this point is whether or not appellee should have initiated and secured affirmative jury findings that the transaction was fair. We hold that she was not so required.

Bell v. Ramirez is patently not in point. There a directed verdict was upheld. There was simply no evidence to overcome the presumption of fraud. There is no contention here that the evidence here was insufficient to overcome a similar presumption.

Scott v. Weaver is similarly inapplicable. Jury findings there, favorable to the trustee, were held to be without supporting evidence.

The text of Texas Jurisprudence cited by appellant contains the statement that "The burden of proving fraud is always on the party who alleges its existence, and this burden never shifts."

The true function and effect of an inconclusive rebuttable presumption, as under discussion here and in the authorities cited by appellant, in Texas, is stated in Texas Law of Evidence, McCormick and Ray, 2d Ed., Sec. 53, to be:

"* * * the presumption places upon the party against whom it operates the burden of producing evidence sufficient to justify a finding of the nonexistence of the presumed fact. This view was adopted by the American Law Institute in its model Code of Evidence, and is the established rule in Texas."

The further elaboration of this rule the above text, Sec. 57, states:

"Whether the jury should be instructed as to a presumption must in the last analysis depend upon the effect to be accorded to the presumption. Under the more generally accepted view (and the Texas view) that the sole effect of a presumption is to fix the burden of producing evidence, obviously presumptions are nothing more than rules for the guidance of the trial judge in locating the burden at a particular time. The court first has to determine whether the opponent has produced sufficient evidence to support a finding of the nonexistence of the presumed fact; if so, the case will proceed as if no one had ever heard of the presumption. If such evidence is not produced the jury

will be directed either absolutely or conditionally to find the presumed fact."

The issue of fraud was, we believe, fairly tried under appropriate and unchallenged instructions, and it is our opinion that appellee was not required as a prerequisite to judgment in her behalf to procure the affirmative findings suggested by appellant. Point six is overruled.

Point seven is that prejudicial error was committed in the manner of submitting the following issue, the objection being that such issue was at variance with the pleadings:

"Do you find from a preponderance of the evidence that prior to Billy Gene Bruce's death in the opinion of the proper official of United Founders Life Insurance Company Billy Gene Bruce was insurable and acceptable for insurance under its rules and practices on the plan of insurance, for the amount of insurance, and at the premium rate set in his application for life insurance? Answer Yes or No.

"Answer: Yes."

The objection was that the time of the event inquired about was not confined to September 5, 1958.

The allegation of the pertinent pleading was that "on or about the 5th day of September, 1958," the event occurred.

In Meyers v. Price, 247 S.W.2d 574, 580, no writ history, we held that "on or about" allegations were sufficient in instances where the exact date was not of great importance. This holding, if sound, is applicable here. It was only important here to prove that the determination of insurability was made prior to the death of the insured.

The period of time covered by this special issue was from July 27, 1958, the date of the insurance application, to October 23, 1958, the date of Mr. Bruce's death.

Considering the latitude given the pleader in alleging facts known only to his adversary,[2] we are of the opinion that the pleading here is broad enough to include the period of time covered by this issue. We are also of the opinion that the Court's issue, framed as it was, was less confusing and more intelligible to the jury than an issue couched in the language of the pleading would have been.

Point seven is overruled.

Points eight, nine and ten, jointly briefed, are that appellee had failed to prove that a contract of insurance was in effect when Mr. Bruce died, particularly that there was no finding that the medical examination of Mr. Bruce was ever completed.

The record contains what appears to be a complete "Medical Examiner's Report" signed by Dr. J. A. Bunyard, September 3, 1958, which was received by appellant on September 5, 1958.

There is evidence that Republic, the reinsurer, desired to inspect some electrocardiograms made by some doctor other than Dr. Bunyard, the medical examiner, regarding Mr. Bruce in 1955 or earlier. As to these Mrs. Helen Smith, appellant's Chief Underwriter, testified:

"Q. Now, insofar as these electrocardiogram tracings were concerned and what might have then been developed arising out of them, they had never been furnished at the time of Mr. Bruce's death, had they? A. No, sir.

"Q. And of course, examining those tracings would be a part of your continuing medical examination of this case, would they not? A. That is correct.

2. See Pleading, Sec. 40, Tex.Jur. McDonald Texas Civil Practice, Sec. 507.

"Q. And so, as a result, for that reason alone, if not others, your medical examination had not yet been completed in the Billy Gene Bruce case is that correct? A. That is correct."

 It is appellant's contention that this testimony raised a fact issue as to whether or not or when the medical examination of Mr. Bruce was completed. We disagree. In our opinion, "Completion of the medical examination" of Mr. Bruce, within the meaning of the receipt using these words, was accomplished when the doctor finished the medical examination which Mr. Bruce was directed to undergo. This fact is indisputably established.

From the fact, and in the event, that completion of the medical examination of Mr. Bruce occurred on September 3, 1958, and the policy, if effective, was effective as of that date, and since Mr. Bruce paid only one month's premium, appellant contends that the contract of insurance expired on October 3, 1958, before the death of Mr. Bruce twenty days later. Thus though Mr. Bruce was never notified that his application was approved and that he owed further premiums, his insurance would or might lapse the instant it came into being.

 We can think of many reasons for refusing to follow appellant's reasoning to this dead-end result, but we content ourselves here by saying that *if* the insurance lapsed on October 3rd it was kept alive for one month under the grace provision of Art. 3.44, Sec. 2, of the Insurance Code. This would place the death of Mr. Bruce within the life of the contract of insurance found by the jury to have been formed.

 Appellee has a cross point to the effect that the Trial Court erred in allowing her attorney's fees and penalties under Art. 3.62, Insurance Code, V.A.C.S.

We overrule this point upon the authority of Colorado Life Co. v. Teague, supra.

The judgment of the Trial Court is affirmed.

Affirmed.

## On Appellant's Motion for Rehearing

Appellant has filed a motion for rehearing signed by its attorneys, W. A. Griffis, Jr. and Craig Porter, of San Angelo, Texas, which contains the following language:

"* * * there is language in the Court's Opinion which is completely unjustified, irresponsible, and, if allowed to remain upon the Minutes of the Third Court of Civil Appeals, will serve only to malign and to impugn the motives, character and reputation of Appellant as an insurance company, when its integrity is not in question, and has not been questioned herein even by the Appellee. Once the present Opinion of this Court is published, Appellant will suffer the consequences of the Court's attack upon it, without opportunity or forum within which to defend itself. As must be obvious, we refer here to the findings and conclusions of the Court that the language of the premium receipt in question and sued upon by Appellee is deceptive, that the language is vague, intangible, misleading and contrary to public interest.

"Added to this unjust indictment of Appellant as a company using a receipt containing such language, is the holding of this Court which will hereafter indict the insurance industry as a whole, for the Court has now said that the sworn testimony of an officer-witness for an insurance company following a loss or alleged loss asserted against the company may be *'realisticly discounted'*; in effect, the Court cannot expect and does not expect that the official of an insurance company would be truthful concerning that company's determination of insurability once a loss has occurred.

\* \* \* \* \* \*

"In the face of Cochran v. Wool Growers Central Storage Company, 166 S.W.2d 904, 140 Tex. 184, and Dunlap v. Wright, [Tex.Civ.App.] 280 S.W. 276, no writ history, this Court not only has cast aside the direct, positive and uncontradicted sworn testimony of the witness Helen Smith, but has found that no proper official of an insurance company can be expected to testify truthfully relative to determination of that official incident to an application presented to the company for insurance. The Court has, by virtue of its utterances, stricken from future cases against insurance companies the necessity for administering oaths to insurance company officials or employees, or of even having them testify. It matters not what they may say—their testimony will be 'realistically discounted', whether there is contradictory testimony or contradicting circumstances, in any event.

"The unmerited and ill-advised language of the Court in its Opinion, as above set forth, warrants complete and immediate rectification, irrespective of anything else the Court may do in connection with this Motion of this case pending upon appeal.

"Proceeding further, it is noted that although Appellee did not find the language of the premium receipt of such nature as to require complaint, did not plead the language of the receipt as being contrary to public policy, or illegal, or deceptive, vague, intangible, or misleading, but rather 'by pleading and proof, assumed the conditions prerequisite to recovery', Colorado Life Insurance Company v. Teague, [Tex.Civ. App.] 117 S.W.2d 849, this Court has boldly assumed the role of advocate by raising these 'defenses' which Appellee did not raise in her lawsuit. This would appear to place these points of 'public interest', 'deceptive language',

and the like, in the category of fundamental error, and yet the Court does not tell us this.

\* \* \* \* \* \*

"It is obvious that this Court, without any complaint, urging, or even suggestion on the part of Appellee or anyone else, has seen fit to disregard entirely the contract upon which the lawsuit was based, and upon which both parties relied in the Trial Court, and has applied the record of this cause to a new contract, a creature of this Court and one entirely devoid of references to the rules and practices of reinsurance which are every day occurrences in the insurance industry.

\* \* \* \* \* \*

"Has the Court, indeed, again found it difficult to explain the obvious or has the Court merely sought and found a means of refuge from the usual necessity in a case upon a contract to apply the law and the facts, if any, *to that contract*. In express*ly* itself continually, not on the contract sued upon, but on a contract created by the Court absent the very heart of the conditional language of the premium receipt, the Court has completely circumvented and negatived those rules and practices of Appellant Company which bring into play the reinsurance procedure existing between Appellant and Republic National Life Insurance Company by saying that such rules and practices are those 'with which the applicant for insurance has not agreed to contract and may not wish to contract'.

\* \* \* \* \* \*

"The Court is further concerned that during the period of time the company is formulating an opinion of insurability, the company will have the premium payment, but the applicant will not be covered by insurance. And yet, the Supreme Court of Texas has found nothing contrary to public policy or good insurance practices in this situa-

tion.[1] Southland Life Insurance Company v. Vela, [147 Tex. 478] 217 S.W. 2d 660, Supreme Court; Southwestern Life Insurance Company v. Evans, [Tex.Civ.App.] 262 S.W.2d 512, writ of error refused. The Court's failure in this regard can only be justified by a complete disregard of the previous jurisprudence of Texas, allowing life insurance companies in Texas the freedom and liberty to accept or reject, and to choose, the applications made to such companies."

■ It is true that appellee did not ask us to review the evidence. It was *appellant* which assigned as error the absence and insufficiency of evidence to support the jury's answers to material issues submitted to it. The first assignment requires us to view the evidence in a manner most favorable to the verdict and the latter assignment requires us

" * * * to consider and weigh all of the evidence in the case and to set aside the verdict and remand the cause for a new trial, if it thus concludes that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust—this, regardless of whether the record contains some 'evidence of probative force' in support of the verdict." In re King's

1. In this case the Court stated:
"No public policy is violated by a contract between an insurance company and an insured whereby premiums are to be paid from the effective date of the policy rather than the date of its delivery, even though the effect thereof is to charge a premium for a period when the insured has no protection. It was pointed out in the case last-above cited, and in the case of Kurth v. National Life & Accident Insurance Co., Inc., Tex.Civ.App., 79 S.W.2d 338, writ refused, that it is to the interest of both parties to have a certain date upon which to calculate not only the due dates of premiums but the premium rate, cash and loan value, and the paid-up insurance benefits available to the insured."

Estate, 150 Tex. 662, 244 S.W.2d 660, 661.

We may have incorrectly evaluated, appraised, considered and weighed the evidence, but we did not improperly do so; nor would we have weighed the evidence at all if appellant had not requested us to do so.

We are not the first court to consider a device by which an insurance company receives pay for a risk not incurred.

In Starr v. Mutual Life Ins. Co. of New York, 1905, 41 Wash. 228, 83 P. 116, 117, the Supreme Court of Washington considered a receipt in this form:

"I have paid $——— to the subscribing soliciting agent, who has furnished me with a binding receipt therefor, signed by the secretary of the company, making the insurance in force from this date, provided this application shall be approved and the policy duly signed by the secretary at the head office of the company and issued."

In discussing this receipt the Court stated:

"The chief object of the provision would, therefore, seem to be to enable the insurance company to collect premiums for a period during which there

This treatment of life insurance is, it seems to us, wholly from an investment point of view. That some life insurance does have investment value is not doubted, but that such is not its principal value is shown by the following quotation taken from a column of the Austin American of May 4, 1961, sponsored by the Austin Chapter of the American Society of Chartered Life Underwriters, made in response to a query as to whether life insurance should be dropped and the premium money put "into bonds or possibly stocks that will bring a more substantial return," the answer, in part, being:
"Comparing bonds or stocks with life insurance is just about like comparing scrambled eggs and orange juice. We happen to like both for breakfast."

was in fact no insurance, and consequently no risk."

In speaking of a similar receipt, the Supreme Court of Oregon in Francis v. Mutual Life Ins. Co. of New York, 1910, 55 Or. 280, 106 P. 323, 327 stated:

"The clause seems to be a mere trick on the part of the insurance company to deceive the applicants into the belief that they have temporary insurance, and thereby induce them to part with their money in advance of the issuance of the policy. It is a practice unworthy of a great business corporation, and is commented upon by Rudkin, J., in Starr v. Mutual Life Ins. Co., 41 Wash. 228, 83 Pac. [116] 117, in terms none too severe."

In Western & Southern Life Ins. Co. v. Vale, 1938, 213 Ind. 601, 12 N.E.2d 350, 354 the Supreme Court of Indiana, in addressing itself to this question stated:

"In other words, it is recognized that such a receipt is calculated to convey the impression to the applicant for insurance that he is insured, and to procure money from him as premium for insurance over a period when he is not insured at all. Put otherwise, it means that, by a device calculated to deceive, the applicant is defrauded out of so much of the premium paid as would provide insurance for the period between the application and the acceptance and delivery of the policy."

In Ransom v. The Penn Mutual Life Ins. Co., 1954, 43 Cal.2d 420, 274 P.2d 633, 635 the Supreme Court of California, in Bank, stated the substance of the Court's language in Albers v. Security Mut. Life Ins. Co., 41 S.D. 270, 170 N.W. 159, with apparent approval as follows:

"* * * it was said that if the company did not intend that the insurance should be effective from the date of the application it would be ob-

taining a premium for a period during which there was no insurance, and this would not be dealing honestly with the insured."

In Metropolitan Life Ins. Co. v. Grant, 9 Cir., 1959, 268 F.2d 307, 311, the involved receipt contained this provision:

"The Company shall incur no liability under this application until a policy has been delivered and the full first premium * * * paid * * * in which case such policy shall be deemed to have taken effect as of the date of issue as recited therein, except as follows: If an amount equal to the full first premium on the policy applied for is paid to and accepted by the Company at the time Part A of this application is signed and if this application is approved at the Company's Home Office for the class, plan and amount of insurance herein applied for, then the insurance in accordance with the terms of the policy applied for shall be in force from the date hereof."

Appellant paid the first premium and was notified to appear for a medical examination, but he was accidentally killed before meeting his appointment. The Court held that there was a contract of interim insurance between the date of the application with payment of premium and approval by the company, one of the Concurring Justices stated:

"I think, as Chief Justice Gibson said, it would be unconscionable to permit the company to escape the obligation thus undertaken by it." [2]

The whole question of binding receipts in life insurance is thoroughly and excellently treated in 44 Yale L.J. p. 1223. The author there says:

"An examination of a large number of binding receipts indicates that for purposes of analysis they are best divisible into two categories. Under one type of receipt, hereafter called the first

---

2. See Ransom v. The Penn Mutual Life Ins. Co., supra.

type, it is provided that any insurance effected shall, by reason of the payment of the premium at the time of the application, be in force from the date of the medical examination, provided the application shall be 'approved and accepted' as applied for, at the home office. Another type of receipt provides that the insurance shall be effective as of the date of the medical examination, if the company shall be satisfied that on that date the applicant was an insurable risk, and that the application was otherwise acceptable under the company's regulations for the amount and plan of the policy applied for."

The receipt before us clearly falls within the first classification.

The author, after stating some of the benefits, other than insurance, which accrues by reason of dating the insurance from the date of the application, continues:

"But despite these various benefits, the fact remains that the applicant does not receive the main object for which a premium is paid and which the language of the receipt may lead him to expect, namely, insurance from the date of payment of the premium.

"To some courts, this latter fact of itself has served to brand the first type of receipt as unfair.

"* * * * * *

"* * * the fact that the insurance company is exacting an unearned premium if it does not become liable from the time of the payment of the initial premium, may well serve to explain the adverse attitude of these courts towards the insurance company using the first type of receipt.

"Regardless, however, of whether these courts' understanding of 'justice' is correct, their attitude has nevertheless led lawyers to believe that other courts which have not adjudicated the issue of the legal effect of the binding

receipt of the first type, will also enforce a 'just relationship.' But since insurance companies are willing to support an opposing view in an attempt to uphold their contracts, as they understand them, litigation necessarily results. It is this consequence, perhaps more than that of unfairness in the terms of the contract, that is thoroughly undesirable, since it conflicts with the recognized purpose of life insurance. Policies are carried by many people with limited resources. For such individuals, court action, with its attendant uncertainties, costs, and postponed payments, naturally is a serious handicap, since it may exhaust much of the benefit to be gained from an insurance policy. And since life insurance is often bought to protect the otherwise impecunious dependents of the insured, the necessity of legal action, regardless of who is finally successful, immediately destroys a large part of the possible benefit of insurance.

"Such a condition would seem socially undesirable. But its elimination will probably depend upon whether companies using the first form of receipt will substitute a more clearly expressed receipt, frankly stating in terms plain even to a layman that the company is bound only as of the date of acceptance, or will adopt the second type of binding receipt, providing for the assumption of an insurance risk by the company from the date of the medical examination. Ordinarily, the only uncertainty which might give rise to litigation under the latter type of receipt would be uncertainty as to the question of fact, whether the applicant was an insurable risk as of the time of the medical examination. At the same time, the adoption of the second form of binding receipt would eliminate the question of possible misrepresentation of non-disclosure arising under the first form of binding receipt.

**314**

*"Past experience has convinced many companies, particularly the larger and more reliable ones, that less stringent agreements, involving fewer legal complexities and defenses, better serve their own interests in the long run. It may be expected therefore, that companies still employing the first form will profit by that experience, and change their receipts as well as their practice to conform to apparently more just methods of doing business."* (Italics ours.)

Yet, appellant asks:

"From whence arises this great concern of this Court for a period of time in which there is no insurance coverage and no knowledge of an applicant as to his status of insured or not insured?"

The answer is simple. Our concern stems from our innate sense of fairness, and from what we conceive to be the well founded disinclination of a person to pay for something he does not receive.

We did not and we do not hold the receipt and its use to be against public policy. In order to hold this, we would need a prohibitory statute or constitutional provision. We believe that such receipt is against the public interest and we certainly are not alone in this view.

Let us make our decision clear. We have discussed and weighed the evidence because it was our duty, activated by appellant and not by appellees, in order to ascertain if the jury verdict was, as appellant contends, so against the overwhelming weight and preponderance of the evidence as to be manifestly unjust. We have considered and weighed the evidence as we believe the jury had a right to consider and weigh it. We have not held, as it appears some courts have held, that appellant is liable as a matter of law, and without the necessity of proving approval of the application of Mr. Bruce. We simply sustain the jury verdict.

The motion is overruled.